

1  Judith B. Gitterman, Bar No. 115661
   JGitterman@perkinscoie.com
2  Gabriel Liao, Bar No. 205897
   GLiao@perkinscoie.com
3  **PERKINS COIE LLP**
   1888 Century Park E., Suite 1700
4  Los Angeles, CA  90067-1721
   Telephone:  310.788.9900
5  Facsimile:  310.788.3399

6  Attorneys for Plaintiffs
   Baskin-Robbins Franchising LLC
7  and BR IP Holder LLC

8           UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10                 SOUTHERN DIVISION

11 BASKIN-ROBBINS FRANCHISING      Case No. **SACV11-00031** CJC(RNBx)
   LLC, a Delaware limited liability
12 company; and BR IP HOLDER LLC, a   **COMPLAINT FOR INJUNCTION**
   Delaware limited liability company,   **AND DAMAGES FOR:**
13
                Plaintiffs,          **1. FEDERAL TRADEMARK**
14                                      **INFRINGEMENT;**
        v.
15                                   **2. FEDERAL TRADEMARK**
   YUN WORLD INC., a California         **DILUTION;**
16 corporation; HYE SUNG YUN, an
   individual; and CHU HAN YUN, an   **3. FALSE DESIGNATION OF**
17 individual,                          **ORIGIN;**

18              Defendants.          **4. BREACH OF CONTRACT;**

19                                   **5. BREACH OF WRITTEN**
                                        **GUARANTY**
20
                                     **6. STATE STATUTORY UNFAIR**
21                                      **COMPETITION;**

22                                   **7. STATE COMMON LAW**
                                        **TRADEMARK INFRINGEMENT**
23                                      **AND UNFAIR COMPETITION;**

24                                   **8. STATE STATUTORY COMMON**
                                        **LAW TRADEMARK DILUTION;**
25                                      **AND**

26                                   **9. MISAPPROPRIATION OF**
                                        **TRADE SECRETS**
27

28

CALENDARED

1      Plaintiffs BASKIN-ROBBINS FRANCHISING LLC and BR IP Holder LLC

2   hereby allege as follows:

3                 **JURISDICTION AND VENUE**

4      1.     This Court has jurisdiction over this action pursuant to 28 U.S.C.

5   §§ 1331 and 1338(b), in that plaintiffs' claims arise under the Lanham Trademark

6   Act, 15 U.S.C. § 1051, *et seq.*, and present a federal question involving unfair

7   competition and trademarks.  Venue is proper in this judicial district pursuant to 28

8   U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to

9   these claims occurred in this district, in particular because the franchised restaurant

10  at issue herein is located in Santa Ana, California, within the Central District of

11  California.

12                **INTRADISTRICT ASSIGNMENT**

13      2.     This action is properly filed in the Southern Division of the United

14  States District Court for the Central District of California because a substantial part

15  of the events or omissions giving rise to these claims occurred in Orange County.

16                       **PARTIES**

17      3.     Plaintiff Baskin-Robbins Franchising LLC ("BRF") is a limited

18  liability company duly organized and existing under the laws of the State of

19  Delaware, with its principal place of business in Canton, Massachusetts.  BRF is

20  registered to sell franchises in the State of California.

21      4.     Plaintiff BR IP Holder LLC ("BR IP") is a limited liability company

22  duly organized and existing under the laws of the state of Delaware, with its

23  principal place of business in Canton, Massachusetts.  BR IP is the owner of all the

24  trademarks, copyrights, and patents relating to Baskin-Robbins' business

25  operations.

26      5.     Plaintiffs BRF and BR IP (collectively, "Baskin-Robbins") are

27  informed and believe, and thereon allege, that defendant Yun World, Inc. ("Yun

28  World") is a California corporation with its principal place of business in Orange

County, State of California.

      6.     Baskin-Robbins is informed and believes, and thereon alleges, that defendant Hye Sung Yun ("H. Yun") is an individual residing in Orange County, California, and is a citizen of the State of California.

      7.     Baskin-Robbins is informed and believes, and thereon alleges, that defendant Chu Han Yun ("C. Yun") is an individual residing in Orange County, California, and is a citizen of the State of California.  (Yun World, H. Yun and C. Yun are collectively referred to herein as "Defendants").

## BASKIN-ROBBINS' TRADEMARKS, SERVICE MARKS, AND TRADE SECRETS

      8.     Baskin-Robbins is engaged in the business of, and has acquired valuable experience and skill in, developing and operating national franchises involving the production, merchandising and sale of ice cream, frozen yogurt, ice milk, sherberts, smoothies, soda fountain items, frozen desserts and other related products through the use of specially designed buildings, equipment, accessories, identification schemes, products, management programs, standards, specifications and proprietary marks, all known as the "Baskin-Robbins System."  Baskin-Robbins is engaged in the business of franchising independent businesspersons to operate Baskin-Robbins shops throughout the United States, including the State of California.  Baskin-Robbins franchisees are licensed to use the trade names, service marks, and trademarks owned by BR IP, and to operate under the Baskin-Robbins System.  Baskin-Robbins and BR IP are the sole and exclusive owners of all proprietary and property rights and interest in and to the Baskin-Robbins System.

      9.     At all times herein relevant, Baskin-Robbins has continually used the name Baskin-Robbins as a trade name and service mark in connection with the operation of licensed Baskin-Robbins stores.  BR IP is the owner of numerous marks registered on the principal register of the United States Patent and Trademark Office.  These marks are referred to collectively herein as the "Baskin-Robbins

1  Marks." The Baskin-Robbins Marks include, but are not limited to, the following:

2

| MARK | REG. NO. | ISSUED |
|------|----------|--------|
| BASKIN-ROBBINS | 1185045 | 01/05/82 |
| BASKIN 31 (IN ARC) ROBBINS | 1783116 | 07/20/93 |
| 31 | 0796902 | 09/28/65 |
| 31 In a Circle Design | 0710670 | 01/31/61 |
| 31 In a Circle Design | 1228930 | 03/01/83 |
| 31 In an Arc Design | 1761925 | 03/30/93 |
| 31 Flavors, Trademark | 1227721 | 02/15/83 |
| 31 Baskin Robbins | 2282002 | 09/28/99 |
| Dots Design | 1807776 | 11/30/93 |
| Dots Design | 1835784 | 05/10/94 |

These registrations, and all other registrations for the Baskin-Robbins Marks, are lawfully owned by BR IP and are subsisting and in full force and effect. Each registration set forth above is *prima facie* evidence of the validity of the registration, of BR IP's ownership of the marks, and of Baskin-Robbins and BR IP's exclusive right to use those marks in commerce on the services and goods listed above, as provided in 15 U.S.C. § 1057(b) and § 1115(a). Such registrations are further constructive notice of BR IP's claim of ownership of the marks pursuant to 15 U.S.C. § 1072.

10.     The Baskin-Robbins Marks have become valuable assets of substantial and inestimable worth to BR IP. The Baskin-Robbins Marks are symbols of quality goods dispensed by Baskin-Robbins' national and international chain of franchised restaurants.

11.     Baskin-Robbins and BR IP have a vital economic interest in protecting the Baskin Robbins name and the Baskin-Robbins Marks. The preservation and protection of the Baskin Robbins name and the Baskin-Robbins Marks is essential

1  to the maintenance of Baskin-Robbins' quality restaurants and the goodwill and

2  reputation associated with them.

3  ### THE FRANCHISES AT ISSUE

4       12.    Baskin-Robbins grants franchises to specific individuals and/or entities

5  selected by Baskin-Robbins.  The franchise agreements and related documents

6  govern the business relationship between Baskin-Robbins and its franchisees,

7  which includes, but is not limited to, the conditional right to use the Baskin-

8  Robbins System in the operation of a Baskin-Robbins restaurant, the duration of the

9  franchise relationship, and the obligations and duties of the persons selected to

10  operate such restaurants.

11       13.    Baskin-Robbins supervises and controls the franchisees' use of the

12  Baskin-Robbins trade name and the Baskin-Robbins Marks through the franchise

13  agreements, which grant limited licensees the conditional right to operate Baskin-

14  Robbins restaurants using Baskin-Robbins Marks, and which require franchisees to

15  meet certain standards and follow certain policies to insure quality products and

16  service to the public.

17       14.    On or about January 15, 2008, Yun World and BRF entered into a

18  franchise agreement which granted Yun World a franchise to operate a Baskin-

19  Robbins restaurant at 2278 E. 17th Street, Santa Ana, California 92705 (the

20  "Franchise Agreement").  A true and correct copy of the Franchise Agreement is

21  attached hereto as Exhibit "A."

22       15.    In the Franchise Agreement, Yun World agreed and acknowledged,

23  among other things:

24           a.    to pay to Baskin-Robbins a weekly continuing franchise fee in

25  an amount equal to five and nine tenths percent (5.9%) of the gross sales of the

26  franchise location (Exh. A, ¶ 4.3);

27           b.    to make weekly contributions to the national advertising fund in

28  an amount equal to five percent (5%) of the gross sales of the franchise location

1    (Exh. A, ¶ 4.4);

2              c.       to make all payments under the Franchise Agreement and pay

3    interest at a rate of one and one-half percent (1.5%) per month for any unpaid

4    amounts (Exh. A, ¶ 4.7);

5              d.       to submit to Baskin-Robbins a weekly statement of gross sales

6    for the franchise location (Exh. A, ¶ 5.2.1);

7              e.       that failure to pay service fees to Baskin-Robbins is a material

8    breach of the Franchise Agreement if those amounts are past due more than seven

9    days, and that Baskin-Robbins is entitled to terminate the Franchise Agreement

10   upon such a material breach (Exh. A, ¶¶ 9.0, 9.0.5, 9.1.1, 9.4);

11             f.       that unpaid service fees due to Baskin-Robbins shall bear

12   interest at the rate of one and one-half percent (1.5%) per month or the highest rate

13   of interest permitted by law (Exh. A, ¶ 9.3);

14             g.       that upon termination of the Franchise Agreement Yun World

15   shall promptly pay Baskin-Robbins all sums owing or accrued from Defendants to

16   Baskin-Robbins, including interest and any damages, costs and expenses, including

17   reasonable attorneys' fees, incurred by Baskin-Robbins by reason of default on the

18   part of Defendants (Exh. A, ¶ 9.4.1);

19             h.       that upon termination of the Franchise Agreement Yun World

20   shall immediately cease to operate the Unit, and shall not thereafter, directly or

21   indirectly, represent to the public or hold themselves out as present or former

22   franchisees of Baskin-Robbins (Exh. A, ¶ 9.4.2);

23             i.       that upon termination of the Franchise Agreement Yun World

24   shall immediately and permanently cease to use, by advertising or in any other

25   manner whatsoever, any feature or method associated with the Baskin-Robbins

26   System, any or all of the Baskin-Robbins Marks and any other trade secrets,

27   confidential information, operating manuals, slogans, trade dress, signs, symbols or

28   devices which are part of Baskin-Robbins System or are otherwise used in

1   connection with the operation of the restaurant.  Yun World agreed that any such

2   unauthorized use or continued use after the termination of the Franchise Agreement

3   shall constitute irreparable harm.  Continued use by Yun World of the Baskin-

4   Robbins Marks after termination of the Franchise Agreement shall constitute willful

5   trademark infringement by Yun World (Exh. A, ¶ 9.4.3);

6          j.      that upon termination of the Franchise Agreement Yun World

7   shall immediately return to Baskin-Robbins all operating manuals, plans,

8   specifications, and other materials in Yun World's possession containing

9   information prepared by Baskin-Robbins and relative to the operation of the

10   restaurant, and all copies thereof (all of which are acknowledged to be Baskin-

11   Robbins property), and shall retain no copy or record of any of the foregoing,

12   except Yun World's copy of the Franchise Agreement, any correspondence between

13   the parties, and any other documents which Yun World reasonably needs for

14   compliance with any provision of law (Exh. A, ¶ 9.4.4);

15          k.      that upon termination of the Franchise Agreement Yun World

16   shall remove from the restaurant's premises and from any equipment, signs, trade

17   fixtures, furnishings and other personal property (except as provided in

18   subparagraph l below) and return to Baskin-Robbins, all of the Baskin-Robbins

19   Marks or other indicia of Baskin-Robbins, and shall disconnect, withdraw and/or

20   terminate, within five (5) days after termination or expiration of the Franchise

21   Agreement, any telephone listings and/or fictitious name registration containing any

22   part of the Baskin-Robbins Marks.  Upon Baskin-Robbins' written demand,

23   however, Yun World shall assign to Baskin-Robbins, upon any termination,

24   expiration or non-renewal of the Franchise Agreement, any telephone number used

25   in the operation of the restaurant if such number is listed in the directory using any

26   of the Baskin-Robbins Marks.  Yun World appointed Baskin-Robbins as its

27   attorney-in-fact, in the name of Yun World, to do any act necessary to effect the

28   intent of this subparagraph (Exh. A, ¶ 9.4.5);

1    l.    that Yun World shall, but only in the case of any early

2    termination of the Franchise Agreement due to Yun World's default, sell to Baskin-

3    Robbins, at Baskin-Robbins' election, any or all of the equipment, interior and

4    exterior signs, trade fixtures, furnishings and other personal property of Yun World

5    used in connection with the restaurant (hereinafter collectively "Equipment"), at the

6    purchase cost when originally installed in the restaurant, less a depreciation

7    deduction computed on a straight line basis over a ten (10) year useful life for the

8    respective items (but in no event less than ten percent (10%) of the original

9    purchase cost for such equipment, fixtures and furnishings).  If Yun World owes a

10   balance due on its purchase or financing of such Equipment, or if the same are

11   otherwise subject to a lien or claim for any indebtedness, the amounts of such

12   balance and/or indebtedness shall be deducted from the purchase price payable to

13   Yun World.  All sums of money due Baskin-Robbins by Yun World may be offset

14   against the purchase price payable to Yun World.  Nothing contained herein,

15   however, shall be construed to entitle Yun World to be released from liability for

16   such unpaid balance or indebtedness, if any, in excess of the portion of the purchase

17   price applied for payment of such debts (Exh. A, ¶ 9.4.6);

18   m.    that upon termination of the Franchise Agreement Yun World

19   shall, at Baskin-Robbins' option by notice to Yun World within thirty (30) days

20   from the date of termination or expiration, assign to Baskin-Robbins any interest

21   which Yun World has in the lease or any other agreement related to the restaurant's

22   premises.  If Baskin-Robbins does not elect to exercise its option to acquire the

23   lease, Yun World shall make such modifications or alterations to the restaurant's

24   premises immediately upon termination or expiration of the Franchise Agreement

25   as may be necessary to distinguish the appearance of the premises from that of

26   other units in the Baskin-Robbins System, and shall make such specific additional

27   changes thereto as Baskin-Robbins may reasonably require for that purpose.  In the

28   event Yun World fails or refuses to comply with these requirements, Baskin-

1    Robbins shall have the right to enter upon the premises, without being guilty of

2    trespass or any other tort, for the purpose of making such changes as may be

3    required, at the expense of Yun World, which expense Yun World agrees to pay

4    upon demand (Exh. A, ¶ 9.4.7);

5          n.    that upon termination of the Franchise Agreement Yun World

6    shall pay to Baskin-Robbins all damages, costs and expenses, including, but not

7    limited to, reasonable investigation and attorneys' fees and other reasonable

8    expenses and costs such as travel costs and payroll expenses for Baskin-Robbins

9    employees, incurred in obtaining injunctive or other relief for the enforcement of

10   any provisions of Section 9 of the Franchise Agreement (Exh. A, ¶ 9.4.8);

11         o.    that upon termination of the Franchise Agreement Yun World

12   shall continue to comply with Section 8 of the Franchise Agreement, for the Post-

13   Term Period specified therein.  If Yun World begins to operate any other business

14   wherever situated, Yun World shall not use, in connection with such other business

15   or the promotion thereof, any reproduction, counterfeit, copy or colorable imitation

16   of any of Baskin-Robbins Marks or trade dress; and Yun World shall not utilize any

17   designation of origin or description or representation which falsely suggests or

18   represent any association or connection with Baskin-Robbins whether or not

19   constituting unfair competition (Exh. A, ¶ 9.4.9);

20         p.    that Yun World's failure to comply with the terms of the

21   Franchise Agreement would cause irreparable damage to Baskin-Robbins for which

22   no adequate remedy at law may be available, and that in the event of Yun World's

23   breach or threatened breach of any of the terms of the Franchise Agreement,

24   Baskin-Robbins shall therefore be forthwith entitled to an injunction restraining

25   such breach, without showing or proving any actual damage or irreparable harm or

26   lack of an adequate remedy at law, and without the requirement for the posting of a

27   bond, which Yun World waived, until a final determination is made by a court of

28   competent jurisdiction (Exh. A, ¶ 9.6);

1    q.    that, in any action instituted by Baskin-Robbins against Yun

2  World as a result of any default or termination of the Franchise Agreement, Baskin-

3  Robbins will be entitled to recover all litigation costs and expenses, including

4  reasonable attorneys' fees, in addition to any judgment entered in its favor (Exh. A,

5  ¶ 9.3); and

6    r.    that any failure of Baskin-Robbins to exercise any power

7  reserved to it under the Franchise Agreement, or to insist upon strict compliance by

8  Yun World with any term, covenant or condition in the Franchise Agreement, and

9  any waiver by Baskin-Robbins of any breach of a term, covenant or condition shall

10  not be deemed to be a waiver of such term, covenant or condition or any subsequent

11  breach of the same or any other term, covenant or condition of the Franchise

12  Agreement (Exh. A, ¶ 13.0).

13    16.    At the time that the Franchise Agreement was executed, defendants H.

14  Yun and C. Yun (collectively, the "Guarantors") signed a personal guaranty by

15  which they guaranteed the full payment of Yun World's monetary obligations to

16  Baskin-Robbins and the performance of all of Yun World's other obligations under

17  the Franchise Agreement and agreed that the Franchise Agreement would be

18  binding on them personally (the "Franchise Guaranty").  The Franchise Guaranty is

19  included in the Franchise Agreement, which is attached hereto as Exhibit A.

20    **THE NOTICES TO CURE**

21    17.    On or about October 22, 2010, Baskin-Robbins sent to Yun World and

22  the Guarantors at the restaurant's premises a written Notice to Cure informing them

23  of Yun World's defaults under the Franchise Agreement, for failure to pay amounts

24  due under the Franchise Agreement, and demanding cure of same (the "Notice to

25  Cure").  Pursuant to the Notice to Cure, Yun World was given fifteen days to cure

26  its defaults.  A true and correct copy of the Notice to Cure is attached as

27  Exhibit "B."  Baskin-Robbins is informed and believes that Yun World and the

28  Guarantors received the Notice to Cure on October 23, 2010.  A true and correct

1  copy of the signed return receipt evidencing delivery of the Notice to Cure is

2  attached as Exhibit "C."

3      18.    More than fifteen days passed after Yun World received the Notice to

4  Cure without the defaults having been cured.

5              **TERMINATION OF THE FRANCHISE AGREEMENTS**

6      19.    On or about November 30, 2010, Baskin-Robbins sent to Yun World a

7  Notice of Termination ("Notice of Termination") based upon Yun World's failure to

8  cure the defaults set forth in the earlier Notice to Cure.  The Notice of Termination

9  was sent to the restaurant's premises.  Termination of the Franchise Agreement was

10  effective immediately upon receipt of the Notice of Termination.  A true and

11  correct copy of the Notice of Termination is attached hereto as Exhibit "D."

12      20.    Baskin-Robbins is informed and believes that Yun World received the

13  Notice of Termination on December 2, 2010, at the restaurant's premises.  True and

14  correct copies of the signed return receipt and the U.S. Postal Service's

15  confirmation of delivery evidencing delivery of the Notice of Termination are

16  attached hereto as Exhibit "E."

17      21.    Defendants still have not paid Baskin-Robbins, and have failed to cure

18  their defaults.  Baskin-Robbins estimates, based on the restaurant's prior reported

19  sales data, that as of November 24, 2010, Defendants owed Baskin-Robbins

20  estimated franchise fees, advertising fees, and other fees in the amount of

21  $8,599.30.  A true and correct copy of Baskin-Robbins Accounts Receivable Status

22  Report for Yun World as of November 24, 2010 is attached hereto as Exhibit "F."

23  At this time, Baskin-Robbins is unable to determine the exact amount of franchise

24  fees and advertising fees owed by Defendants because they have failed to submit all

25  the statements of gross sales upon which the franchise and advertising fees are

26  based.  Accordingly, Baskin-Robbins' estimate is subject to change when and if

27  Defendants submit additional statements of gross sales for the restaurant.  By the

28  terms of the Franchise Agreement and Baskin-Robbins' Notice of Termination, Yun

1   World's franchise has now terminated.  Having chosen to stop its own performance

2   under the parties' Franchise Agreement by refusing to make required payments,

3   Yun World effectively terminated the Franchise Agreement itself.

4         22.    In its Notice of Termination, Baskin-Robbins made written demand on

5   Yun World to take such actions as are necessary to comply with their post-

6   termination obligations as set forth in the Franchise Agreement, including but not

7   limited to immediately ceasing the use of any methods associated with Baskin-

8   Robbins, ceasing the use of any and all trademarks, service marks, and all other

9   proprietary marks and methods of trade identification, and all trade secrets of

10  Baskin-Robbins, confidential information, signs, symbols, and slogans belonging to

11  Baskin-Robbins.  Baskin-Robbins further demanded that Yun World immediately

12  cease use of and return all Baskin-Robbins manuals to Baskin-Robbins and make

13  immediate arrangements with Baskin-Robbins to immediately de-identify Yun

14  World's location of all signs, symbols, slogans and proprietary marks belonging to

15  Baskin-Robbins.

16        23.    Notwithstanding Yun World's non-performance under the Franchise

17  Agreement, the resulting termination of the Franchise Agreement, and the

18  previously referenced Notice of Termination, Defendants have continued to operate

19  the restaurant as a Baskin-Robbins restaurant, using the Baskin-Robbins Marks and

20  using Baskin-Robbins property without having any right or license to do so.

21        24.    Defendants' continuing unauthorized use of the Baskin-Robbins Marks

22  is causing Baskin-Robbins irreparable injury.

23  
### FIRST CLAIM
**(Federal Trademark Infringement)**
**[15 U.S.C. § 1114(1)]**
**[Against All Defendants]**

26        25.    Baskin-Robbins realleges and incorporates by reference each and

27  every allegation set forth in Paragraphs 1 through 24, inclusive.

28

26.     Baskin-Robbins' Federal Trademark Registrations, such as those referred to above in paragraph 9, are in full force and effect.

27.     The Baskin-Robbins Marks have not been abandoned and are widely used by Baskin-Robbins throughout the United States.  Baskin-Robbins intends to preserve and maintain its rights to the Baskin-Robbins Marks and to continue to use said Marks for the operation of its restaurants.

28.     Defendants have continued to use the Baskin-Robbins Marks without the consent of Baskin-Robbins after termination of the Franchise Agreement, in violation of Paragraph 9.4.3 of the Franchise Agreement.  The unauthorized use by Defendants of the Baskin-Robbins Marks constitutes trademark infringement of the Baskin-Robbins Marks and is likely to cause confusion and mistake in the minds of the purchasing public as to the source of products in violation of 14 U.S.C. § 1114(1).

29.     Baskin-Robbins is informed and believes, and thereon alleges, that Defendants' activities complained of herein constitute willful and intentional infringements of the Baskin-Robbins Marks in total disregard of Baskin-Robbins' proprietary rights, and that they were carried out despite Defendants' knowledge that the use of the Baskin-Robbins Marks or any reproduction, copy, or colorable imitation thereof was and is in direct contravention of Baskin-Robbins' rights.

30.     Baskin-Robbins has no adequate remedy at law.  Defendants' conduct has caused, and if not enjoined, will continue to cause, irreparable harm and damage to the rights of Baskin-Robbins in its Marks and to the business, reputation and goodwill of Baskin-Robbins.

31.     By reason of the foregoing, Baskin-Robbins is entitled to preliminary and permanent injunctive relief against Defendants, restraining further acts of trademark infringement.

### SECOND CLAIM
### (Federal Trademark Dilution)
### [15 U.S.C. § 1125(c)]
### [Against All Defendants]

32.    Baskin-Robbins realleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 31, inclusive.

33.    The Baskin-Robbins Marks, such as those set forth in paragraph 9 above, are distinctive and famous, have been used throughout the United States and worldwide, and are well-known to the trade and members of the purchasing public. The public generally associates and identifies the Baskin-Robbins Marks with Baskin-Robbins.

34.    Defendants' conduct after termination of the Franchise Agreement in the advertising, distribution, sale and/or offer for sale of infringing products and services bearing the Baskin-Robbins Marks constitutes dilution of the Baskin-Robbins Marks, in that such conduct dilutes the distinctive quality of said Marks by diminishing Baskin-Robbins' ability to identify and distinguish its goods or services in violation of 15 U.S.C. § 1125(c).

35.    Baskin-Robbins is informed and believes, and thereon alleges, that Defendants' actions were done willfully, with an intent to exploit Baskin-Robbins' reputation and dilute the Baskin-Robbins Marks.

36.    Baskin-Robbins has no adequate remedy at law.  The conduct of Defendants described above has caused, and if not enjoined, will continue to cause, irreparable damage to the rights of Baskin-Robbins in the Baskin-Robbins Marks, and to the business, reputation and goodwill of Baskin-Robbins.

37.    By reason of the foregoing, Baskin-Robbins is entitled to preliminary and permanent injunctive relief against Defendants, restraining further acts of trademark infringement.

## THIRD CLAIM
### (False Designation of Origin and False Description)
### [15 U.S.C. § 1125(a)]
### [Against All Defendants]

38.    Baskin-Robbins realleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 37, inclusive.

39.    Baskin-Robbins' numerous Marks, including those set forth above in paragraph 9, are distinctive, have been used throughout the United States and worldwide, and are well known to the trade and members of the purchasing public. The public generally associates and identifies Baskin-Robbins Marks with Baskin-Robbins.

40.    Defendants' conduct after termination of the Franchise Agreement in distribution, advertising, sale, offering for sale, and/or other use of the infringing products and services bearing the Baskin-Robbins Marks constitutes false designation of origin or sponsorship of said products and services, and intends falsely to represent that the Baskin-Robbins Marks originate from Baskin-Robbins or that said products and services have been sponsored, approved, or licensed by Baskin-Robbins or are in some way affiliated or connected with Baskin-Robbins. Such conduct of Defendants is likely to confuse, mislead, and deceive Baskin-Robbins' customers, purchasers, and members of the public as to the origin of said trademarks, or cause said persons to believe that those products and/or Defendants have been sponsored, approved, authorized, or licensed by Baskin-Robbins or are in some way affiliated or connected with Baskin-Robbins, all in violation of 15 U.S.C. § 1125(a).

41.    Upon information and belief, Defendants' actions were done willfully with full knowledge of the falsity of such designations of origin and false descriptions or representations, and with the express intent to cause confusion, and to mislead and deceive the purchasing public.

42.    Baskin-Robbins has no adequate remedy at law.  Defendants' conduct

1  described above has caused and, if not enjoined, will continue to cause irreparable

2  damage to the rights of Baskin-Robbins and the Baskin-Robbins Marks and to the

3  business, reputation and goodwill of Baskin-Robbins.

4      43.    By reason of the foregoing, Baskin-Robbins is entitled to preliminary

5  and permanent injunctive relief against Defendants, restraining further acts of

6  trademark infringement.

### FOURTH CLAIM
### (Breach of Contract)
### [Against Defendant Yun World, Inc.]

9      44.    Baskin-Robbins realleges and incorporates by reference each and

10  every allegation set forth in Paragraphs 1 through 43, inclusive.

11      45.    Baskin-Robbins has performed all promises required on its part to

12  have been performed under the terms of the Franchise Agreement except to the

13  extent prevented from doing so by Defendants.  Baskin-Robbins has complied with

14  all applicable laws and regulations which govern franchise sales and relations,

15  including compliance with the California Franchise Investment Law and the

16  Franchise Relations Act, including, without limitation, Business and Professions

17  Code §§ 20020 and 20021.

18      46.    Yun World has breached the Franchise Agreement as follows:

19          a.    it is delinquent in advertising fees, franchise fees, and attorneys'

20  fees owed under the Franchise Agreement; and

21          b.    it has violated the Franchise Agreement by using the Baskin-

22  Robbins Marks, service marks, trade names, trade secrets, and other elements of the

23  Baskin-Robbins System after termination of the franchises.

24      47.    As a result of Yun World's breach of the Franchise Agreement,

25  Baskin-Robbins has suffered and continues to suffer irreparable harm to its

26  reputation.  Although Yun World appears to the general public to be affiliated with

27  the Baskin-Robbins System and to be selling Baskin-Robbins products and offering

Baskin-Robbins services, Yun World is no longer subject to the trademark controls and operational directions contained in the Franchise Agreements.

48.     These breaches are material breaches of the Franchise Agreement that go to the heart of Baskin-Robbins right to control the use of its trade names, trade secrets, and the Baskin-Robbins Marks, and to ensure the quality of the products distributed under its name.  This conduct has interfered with the continued goodwill of the Baskin-Robbins system with the public, which relies upon and has come to trust in Baskin-Robbins good reputation.

49.     As a direct and proximate cause of all of the material breaches described above, Baskin-Robbins has been damaged in an amount which cannot be fully measured, but which, including damages to loss of goodwill and reputation and other consequential damages, exceeds $75,000.

50.     Baskin-Robbins is entitled to attorneys' fees under Paragraphs 9.3 and 9.4.8 of the Franchise Agreement.

**FIFTH CLAIM**
**(Breach of Written Guaranty)**
**[Against Defendants H. Yun and C. Yun]**

51.     Baskin-Robbins realleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 50, inclusive.

52.     Defendants H. Yun and C. Yun have breached their Franchise Guaranty by failing to pay the monies due to Baskin-Robbins under the Franchise Guaranty and by failing to secure the performance of all of Yun World's other obligations under Franchise Agreement.

53.     As a direct and proximate cause of the material breaches by defendants H. Yun and C. Yun of their Franchise Guaranty, Baskin-Robbins has suffered damages in an amount which cannot be fully measured, but which, including damages to loss of goodwill and reputation and other consequential damages, exceeds $75,000.

54. Baskin-Robbins is entitled to attorney's fees under Paragraphs 9.3 and 9.4.8 of the Franchise Agreement.

**SIXTH CLAIM**
**(State Statutory Unfair Competition)**
**[Cal. Bus. & Prof. Code §§ 17200 *et seq.*]**
**[Against All Defendants]**

55. Baskin-Robbins realleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 54, inclusive.

56. Defendants' conduct as herein alleged constitutes unfair methods of competition in violation of the provisions of sections 17200 *et seq.* of the California Business and Professions Code. The acts and conduct of Defendants complained of herein have caused Baskin-Robbins irreparable injury, and will, unless restrained, further impair the value of the Baskin-Robbins Marks and Baskin-Robbins trade name, reputation and goodwill. Baskin-Robbins has no adequate remedy at law.

57. Baskin-Robbins is informed and believes, and thereon alleges, that Defendants have unlawfully obtained profits through acts of unfair competition. Defendants should be forced to disgorge such unlawful profits to Baskin-Robbins.

**SEVENTH CLAIM**
**(California Common Law**
**Trademark Infringement and Unfair Competition)**
**[Against All Defendants]**

58. Baskin-Robbins realleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 57, inclusive.

59. This claim arises under the common law of this state relating to trademark infringement, unfair competition, and "palming off." This court has jurisdiction over the subject matter of this claim pursuant to the provisions of 28 U.S.C. § 1338(b), this being a claim of unfair competition joined with a substantial and related claim under the trademark laws of the United States. In addition, this court has jurisdiction over this claim under the principles of supplemental

1    jurisdiction as set forth at 28 U.S.C. § 1367.

2         60.    Baskin-Robbins is the owner of all rights, title, and interest in and to

3    the distinctive trade names, trademarks, designs, symbols, and logos used by

4    Baskin-Robbins by virtue of Baskin-Robbins extensive sale and distribution of

5    products and services bearing such trade names, trademarks, designs, symbols, and

6    logos (collectively the "Baskin-Robbins Common Law Trademarks") as set forth in

7    the preceding paragraphs of this complaint.

8         61.    The infringing products and services of Defendants are an

9    unauthorized use by Defendants of the Baskin-Robbins Common Law Trademarks,

10   which use constitutes trademark infringement and unfair competition.  It is likely to

11   cause confusion and mistake in the minds of the trade and the purchasing public as

12   to the source of the infringing products and services, and to cause the public to

13   believe Defendants' infringing products and services are authentic products of

14   Baskin-Robbins when, in fact, they are not.

15        62.    Baskin-Robbins is informed and believes, and thereon alleges, that

16   Defendants have intentionally appropriated one or more of the Baskin-Robbins

17   Common Law Trademarks with the intent of causing confusion, mistake, and

18   deception as to the source of Defendants' services and products and with the intent

19   to palm off their services and products as those of Baskin-Robbins.  As such,

20   Defendants have committed trademark infringement, unfair competition, and

21   palming off under California common law.

22        63.    By such actions in infringing the Baskin-Robbins Common Law

23   Trademarks, Defendants are improperly trading upon Baskin-Robbins reputation

24   and goodwill and are impairing Baskin-Robbins' valuable rights in and to such

25   trademarks.

26        64.    Baskin-Robbins is informed and believes, and thereon alleges, that the

27   activities of Defendants complained of herein constitute unfair competition and

28   willful and intentional acts of infringement of the Baskin-Robbins Common Law

1    Trademarks.

2        65.    Baskin-Robbins has no adequate remedy at law.  The conduct of

3    Defendants has caused, and if not enjoined, will continue to cause, irreparable

4    damage to the rights of Baskin-Robbins in the Baskin-Robbins Common Law

5    Trademarks and to Baskin-Robbins' business reputation and goodwill.

6        66.    As the result of the aforesaid acts of Defendants, Baskin-Robbins has

7    suffered loss of profits and other damage, and Defendants have earned profits in an

8    amount to be proven at trial.

9                          **EIGHTH CLAIM**

10        **(State Statutory and Common Law Trademark Dilution)**
           **[Cal. Bus. & Prof. Code § 14330]**
11                      **[Against All Defendants]**

12        67.    Baskin-Robbins realleges and incorporates by reference each and

13    every allegation set forth in Paragraphs 1 through 66, inclusive.

14        68.    This claim arises under California Business & Professions Code

15    § 14330 and the common law of the State of California.  This court has jurisdiction

16    over the subject matter of this claim pursuant to the provisions of 28 U.S.C.

17    § 1338(b), this being a claim of trademark dilution joined with a substantial and

18    related claim under the trademark laws of the United States.  In addition, this court

19    has jurisdiction over this claim under the principles of supplemental jurisdiction as

20    set forth at 28 U.S.C. § 1367.

21        69.    Defendants' acts have caused a likelihood of injury to Baskin-Robbins'

22    goodwill and business reputation, impaired the effectiveness of the Baskin-Robbins

23    Trademarks, and diluted the distinctive trade names and marks of Baskin-Robbins.

24        70.    As such, Defendants' continued unauthorized use of the trademarks

25    violates the trademark laws of the State of California and specifically California

26    Business & Professions Code § 14330.

27        71.    Baskin-Robbins has no adequate remedy at law.  Defendants' conduct

28

---

1   has caused, and if not enjoined, will continue to cause, irreparable damage to the

2   rights of Baskin-Robbins in the Baskin-Robbins Trademarks and to its business,

3   reputation, and goodwill.

### NINTH CLAIM
### (State Statutory and Common Law
### Misappropriation of Trade Secrets)
### [Cal. Civ. Code § 3426 *et seq.*]
### [Against All Defendants]

8   72.   Baskin-Robbins realleges and incorporates by reference each and

9   every allegation set forth in Paragraphs 1 through 71, inclusive.

10   73.   Baskin-Robbins has developed a unique concept for the operation of

11   Baskin-Robbins restaurants that includes confidential information and trade secrets.

12   Baskin-Robbins' franchisees are given access to such proprietary information,

13   including, without limitation, recipes, measurements, temperatures, processes, time

14   schedules, systems, details as to the Baskin-Robbins System's theory and practice,

15   ingredient standards, ingredient supplier lists, equipment standards, special uses of

16   equipment and equipment supplier lists, operations procedures, methods of

17   inventory control, bookkeeping and accounting procedures, business practices and

18   policies, and other management and advertising policies (collectively, the "Trade

19   Secrets").

20   74.   The Trade Secrets constitute information, formulae, methods,

21   techniques, and processes that derive independent economic value from not being

22   generally known to the public or to persons who might obtain economic value from

23   their disclosure or use.  At all times, Baskin-Robbins' Trade Secrets have been the

24   subject of reasonable and diligent efforts to preserve and maintain their secrecy.

25   75.   Following the termination of their franchise, Defendants have used the

26   Trade Secrets without the consent of Baskin-Robbins.  At the time of Defendants'

27   use of the Trade Secrets, Defendants knew or had reason to know that their

28   knowledge of the Trade Secrets had been acquired under circumstances which gave

rise to a duty to maintain their secrecy and to limit their use.  Specifically, Defendants executed Franchise Agreements in which they promised to refrain from divulging or using the Trade Secrets after termination of their franchises (Exh. A, ¶ 8.1).

76.     Defendants have misappropriated Baskin-Robbins' Trade Secrets and ought to be enjoined from further doing so.

77.     Baskin-Robbins prays for an award of its actual damages for its losses caused by the acts of misappropriation by Defendants and for the unjust enrichment caused by Defendants' misappropriation.  To the extent such damages are not provable, Baskin-Robbins prays for an award of reasonable service fees.

78.     Baskin-Robbins is informed and believes, and thereon alleges, that Defendants' continued use of the Trade Secrets after the termination of their franchises has been made in bad faith, willfully, and with malice, warranting an award of attorneys' fees under Civil Code § 3426.4.

79.     Based upon Defendants' willful and malicious misappropriation, Baskin-Robbins prays for an award of exemplary damages under Civil Code § 3426.3.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs, Baskin-Robbins and BR IP, pray:

1.     For an Order declaring:  (1) that the Franchise Agreement has terminated as of December 2, 2010; (2) that Defendants have infringed Baskin-Robbins' trade names, service marks, and trademarks; and (3) that Defendants and their employees, agents, servants, and attorneys be preliminarily and permanently enjoined to:

a.     immediately cease to hold themselves out as franchisees of Baskin-Robbins, and shall not, directly or indirectly, represent to the public or hold themselves out as present or former franchisees of Baskin-Robbins;

b.     immediately cease to use, in advertising or in any other manner

1   whatsoever, and refrain from disclosing, revealing, or publishing any feature or

2   method associated with the Baskin-Robbins System, any Baskin-Robbins Marks,

3   and any other trade secrets, confidential information, operating manuals, slogans,

4   trade dress, signs, symbols or devices which are part of the Baskin-Robbins

5   System;

6           c.      immediately return to Baskin-Robbins all operating manuals,

7   plans, specifications, and other materials in their possession containing information

8   prepared by Baskin-Robbins, and all copies thereof, and shall retain no copy or

9   record of any of the foregoing, except Defendants' copy of the Franchise

10  Agreement, any correspondence between the parties, and any other documents

11  reasonably needed for compliance with any provision of law;

12          d.      immediately remove from the restaurant's premises and from

13  any equipment, signs, trade fixtures, furnishings and other personal property and

14  return to Baskin-Robbins, all of the Baskin-Robbins Marks or other indicia of

15  Baskin-Robbins, and shall disconnect, withdraw and/or terminate any telephone

16  listings and/or fictitious name registration containing any part of the Baskin-

17  Robbins Marks.  Upon Baskin-Robbins written demand, however, Defendants shall

18  assign to Baskin-Robbins any telephone number used in the operation of the

19  restaurant if such number is listed in the directory using any of the Baskin-Robbins

20  Marks;

21          e.      immediately destroy or surrender to Baskin-Robbins all signs,

22  stationery, forms, printed matter, advertising, and paper goods containing the

23  Baskin-Robbins Marks and any name or mark containing the designation "Baskin-

24  Robbins" and every other deceptively similar name and mark, or any other

25  designation indicating or intending to indicate that they are an authorized Baskin-

26  Robbins franchisee;

27          f.      make such modifications or alterations to the restaurant's

28  premises as may be necessary to distinguish the appearance of the premises from

1   that of units in the Baskin-Robbins System;

2          g.      refrain from using, in connection with any business or the

3   promotion thereof, any reproduction, counterfeit, copy or colorable imitation of any

4   of the Baskin-Robbins Marks or trade dress;

5          h.      refrain from utilizing any designation of origin or description or

6   representation which falsely suggests or represents any association or connection

7   with Baskin-Robbins; and

8          i.      refrain from preventing or limiting authorized representatives of

9   Baskin-Robbins from access to books, records, and accounts of Defendants to

10  ascertain the extent of Baskin-Robbins' damages as a result of Defendants' conduct;

11  2.      That Baskin-Robbins recover from Defendants statutory, actual, and

12  punitive damages on account of Defendants' breach of contract, misappropriation of

13  trade secrets, and unfair competition;

14  3.      For an accounting of Defendants' profits and for disgorgement of those

15  profits to Baskin-Robbins pursuant to 15 U.S.C. § 1117 and/or California Business

16  & Professions Code § 17200 *et seq.*;

17  4.      For treble the damages awarded; and

18  5.      That Baskin-Robbins be awarded its attorneys' fees, costs of suit, and

19  all other and further general relief to which it may be entitled, together with interest

20  thereon at the legal rate.

21  DATED:  January ___5___, 2011              **PERKINS COIE** LLP

22

23                                            By: _____

24                                                Gabriel Liao

25                                            Attorneys for Plaintiffs
                                              Baskin-Robbins Franchising LLC and
26                                            BR IP Holder LLC

27

28

# EXHIBIT

## "A"

SDA #_____                                            PC #331308

# FRANCHISE AGREEMENT

This Franchise Agreement is dated __1__/__15_____, 200_8_ and made by and between **BASKIN-ROBBINS FRANCHISING LLC** (hereinafter "BASKIN-ROBBINS"), a Delaware limited liability companies, with principal offices in Canton, Massachusetts (such corporations are hereinafter individually or collectively referred to as "FRANCHISOR") and the following individual(s) and/or entity:

<u>**YUN WORLD INC., a California corporation**</u>
(hereinafter individually or collectively referred to as "FRANCHISEE")

This Franchise Agreement includes the Contract Data Schedule, General Terms and Conditions designated as ("GTC 04-07") and the Special Terms and Conditions identified in Item "J" of the Contract Data Schedule below.

## CONTRACT DATA SCHEDULE

A.   <u>Location of the Franchised Unit</u> (the "Premises"):

| 2278 | E. 17TH Street | Samta Ana | California | 92705 |
|---|---|---|---|---|
| (number) | (street) | (city or town) | (state) | (zip code) |

B.   <u>Term:</u> _____ In the case of an existing Unit, until June 12, 2012.

C.1.   <u>Initial Franchise Fee:</u> _____ dollars (    N/A    )

C.2.   <u>Initial Training Fee:</u> _____ dollars (  $2.140.00  )

D.   <u>Marketing Start-Up Fee:</u> _____ dollars (    N/A    )

E.   <u>Continuing Franchise Fee Rate:</u> _____Five and Nine Tenths percent (5.9%) of Gross Sales

E.2.   <u>Initial On-line Training Access Annual Fee:</u> _____ dollars (   $ 360.00   )

F.   <u>Minimum Continuing Advertising Fee Rate:</u> ----------------------FIVE-- percent ( 5.0%) of Gross Sales

G.   <u>Refurbishment Date:</u> _____In the case of an existing unit, Not Applicable.
     <u>Remodel Date:</u> _____ In the case of an existing unit, on In the case of an existing unit, on July 10, 2008.

H.   <u>Transfer Fee:</u> As provided in subsection 10.4 of the General Terms and Conditions, unless another
     amount is inserted here: _____NO CHANGE_____

I.   <u>Address for notice to FRANCHISEE</u> shall be at the Unit Premises, unless another address is inserted
     here: _____

J.   <u>Special Terms and</u>        [X] <u>Special Terms and Conditions Applicable to a Baskin-Robbins Franchise</u>
     <u>Conditions:</u>

                        [X] <u>Provisions Applicable to a Single Brand Baskin-Robbins Franchise</u>

                        [X] <u>Additional Terms and Conditions Applicable to a Baskin-Robbins Franchise</u>
                            <u>Pursuant to the Baskin-Robbins Franchise Royalty Conversion Offer</u>

K.   The Designated Representative for this Unit is _____*HYE Sung   Yun (Jenny)*_____
                                                    *[print full name above]*
     *(List only one person. See definitions in General Terms and Conditions.)*

L.   Arbitration under this Agreement shall be initiated in the city and state of Los Angeles, CA.

M.   <u>Development Agent Fee:</u> _____ dollars (    N/A    )
                  (If not paid under a Store Development Agreement)

Form last revised 04/07

Franchisor's entities are EOE and AA Employers
(Franchisees are not employees)

*Exhibit A Page 25*

BR-DD GTC-04-07

# FRANCHISE AGREEMENT
© April 2007

## GENERAL TERMS AND CONDITIONS

### INTRODUCTION

**Baskin-Robbins Franchising LLC,** a Delaware limited liability company ("BASKIN-ROBBINS") and **Dunkin' Donuts Franchising LLC,** a Delaware limited liability company ("DUNKIN' DONUTS") are indirect, wholly-owned subsidiaries of Dunkin' Brands, Inc. As a result of the expenditure of time, effort and money, each subsidiary has acquired experience and skill in the development and operation of food service establishments using distinctive systems and techniques for the production, distribution, merchandising and sale of branded food products, including, without limitation, *Baskin-Robbins*® ice cream, yogurt and novelties and *Dunkin' Donuts*® donuts, coffee and freshly baked goods, and other unique and distinctive products, services and business methods (hereinafter each called a "System" and collectively called the "Systems").

The distinguishing characteristics of these Systems include, without limitation, distinctive exterior and interior design, decor, color and identification schemes and furnishings; specially designed manufacturing and merchandising equipment; unique and proprietary information technologies and software; special menu items; standards, specifications and procedures for operations, manufacturing, distribution and delivery; quality of products and services offered; management programs; training and assistance; and marketing, advertising and promotional programs, all of which may be changed, supplemented, improved and further developed from time to time by FRANCHISOR as new learning and best practices are identified and incorporated.

### DEFINITIONS

As used throughout this Agreement, the following defined terms shall have the following meanings:

A.      The "Proprietary Marks" are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin and trade names, which identify for the public the source of goods and services marketed thereunder and represent to the public high and uniform standards of quality, cleanliness, appearance and service, including, without limitation, *Dunkin' Donuts*® licensed by DUNKIN' DONUTS and *Baskin 31 Robbins*® licensed by BASKIN-ROBBINS, both of which are registered trademarks on the Principal Register of the United States Patent and Trademark Office.

B.      "FRANCHISOR" refers to Dunkin' Donuts Franchising LLC with respect to the Dunkin' Donuts System and/or Baskin-Robbins Franchising LLC, with respect to the Baskin-Robbins System.

C.      "FRANCHISEE" means the person(s) or entity who signed this Agreement, which may include a sole proprietor, all partners of a general partnership, a corporation or a limited liability company ("LLC"). No person or entity may claim an interest in this Agreement or any Franchise granted hereby without FRANCHISOR's prior written approval.

D.      The "Unit" means the branded food service establishment, including the fixtures, furnishings, equipment, inventory and supplies located therein and/or attached thereto, operated by FRANCHISEE pursuant to this Agreement. If this Agreement authorizes more than one brand, the term "Unit" shall refer to all branded operations authorized hereby, unless such reference is expressly limited to any one brand.

E.      The "Premises" means the land and building or the area within a building, as the case may be, which is (i) approved by FRANCHISOR, (ii) dedicated to the operation of the Unit, and (iii) in the exclusive possession and control of FRANCHISEE. Some portion of the Premises may be under shared possession or control, if approved by FRANCHISOR.

F.      The term "Lease" means the document by which FRANCHISEE occupies and controls the Premises, whether the landlord is a third-party or FRANCHISOR, or one of its subsidiaries or affiliates.

G.      "Gross Sales" means and includes all revenue from the sale of all products and services and all other income of every kind and nature related to the Unit, whether for cash, by redemption of gift certificates or for credit, regardless of collection; provided, however, "Gross Sales" does not include the incidental sales of gift certificates or newspapers, incidental receipts from pay telephones, or any sales taxes or other taxes FRANCHISEE collects from customers for transmittal to the appropriate taxing authority.

H.      The "Designated Representative" is the person from time to time designated by FRANCHISEE as being responsible for the day-to-day operation of the Unit. The Designated Representative must meet FRANCHISOR's then-current qualifications, including, without limitation, successful completion of FRANCHISOR's training, and must be authorized to act for and bind FRANCHISEE in all dealings with FRANCHISOR with respect to the day-to-day operation of the Unit. The initial Designated Representative is identified in Item "K" of the Contract Data Schedule of this Agreement.

Exhibit _A_ Page _26_

-2-

I.     The "Standards" are requirements, specifications, criteria, guidelines, processes, techniques and standards which are from time to time established and revised by FRANCHISOR with respect to selection and development of the Premises, operation of the Unit and other aspects of each System. Examples of "Standards" are, without limitation, requirements and criteria for developing the Unit; specifications for the facility, equipment and products; business processes and techniques for the operation of the Unit; and guidelines and standards for quality, cleanliness, appearance and service.

## Section 1.  Grant of the Franchise and Term

1.0     This Agreement grants to FRANCHISEE the right, subject to all of the terms and conditions hereinafter set forth, to operate a Unit solely at the Premises described in Item "A" of the Contract Data Schedule of this Agreement, including the right to use, solely in such Unit, the System or Systems and Proprietary Marks described in the Special Terms and Conditions attached to and made a part of this Agreement (the "Franchise").  The term of this Agreement shall begin on the date hereof and shall end on the date described in Item "B" of the Contract Data Schedule; provided however, the Franchise shall commence upon the occurrence, of all of the following conditions prior to the initial opening of the Unit or the transfer of the Unit, as the case may be:

1.0.1     Training.  FRANCHISEE and its Designated Representative must successfully complete the then-current training program required by FRANCHISOR at one or more of FRANCHISOR's training centers located in Massachusetts, California or at other locations from time to time designated by FRANCHISOR.  This requirement may be waived or modified by FRANCHISOR, in whole or in part, in its sole discretion, if FRANCHISEE or its Designated Representative has had comparable training or on-the-job experience.

1.0.2     Financing.  Upon request by FRANCHISOR, FRANCHISEE must deliver evidence to FRANCHISOR that FRANCHISEE has obtained binding commitments for all financing needed to develop and/or operate the Unit.

1.0.3     Documents.  FRANCHISEE must execute and deliver to FRANCHISOR all documents related to this Franchise customarily required, in then-current form, as provided by FRANCHISOR.

1.0.4     Payment.  FRANCHISEE must, prior to opening or transferring the Unit (as the case may be) pay FRANCHISOR any and all moneys due, including, but not limited to, purchase price, fees, inventory, rent and/or security deposit, if required under the Lease.

1.0.5     Possession.  FRANCHISEE must have the exclusive right to occupy and use the Premises for at least the term of this Agreement, whether FRANCHISEE owns the Premises, or leases the Premises pursuant to either (a) a Lease with a third party landlord on terms satisfying FRANCHISOR's then current lease policy and containing provisions required by FRANCHISOR; or (b) a Lease with FRANCHISOR or an affiliated entity.

1.0.6     For a New Unit.  If this Unit is newly developed, FRANCHISEE must, prior to the Unit's initial opening, comply with all provisions of the Special Terms & Conditions attached to this Agreement relating to new unit development (Schedule "F/D" or "C/D", as applicable).

1.1     The term of this Agreement shall expire without notice upon any earlier expiration or termination of a Lease, foreclosure of a mortgage, or other event which has the effect of terminating FRANCHISEE's possession and occupancy of the Unit.

1.2     FRANCHISEE represents and warrants that FRANCHISEE and each individual partner, member and/or shareholder of FRANCHISEE, as the case may be, is a United States citizen or a lawful resident alien of the United States; that, where applicable, the FRANCHISEE entity (corporation or LLC) is and shall remain duly organized and in good standing during the term of this Agreement; and that all financial and other information which FRANCHISEE has provided to FRANCHISOR in connection with FRANCHISEE's application for this Franchise is true and accurate. FRANCHISEE's representations and warranties under this paragraph 1.2 are a material inducement to FRANCHISOR's grant of the Franchise to FRANCHISEE.

## Section 2.  Services Furnished by FRANCHISOR

2.0     FRANCHISOR, or its designee, agrees:

### 2.1     Prior to and For the Initial Opening of the Unit.

2.1.1     FRANCHISOR shall make available to FRANCHISEE Standards for the design, construction, equipping and operation of the Unit; and

2.1.2     FRANCHISOR shall make available to two individuals designated by FRANCHISEE, one of whom must be a party to or guarantor of this Agreement FRANCHISOR's then current initial training program with respect to the operation of the Unit, at one or more of FRANCHISOR's Training Centers located in Massachusetts, California and/or at such other training facility as FRANCHISOR may, from time to time, designate; and

2.1.3     FRANCHISOR shall provide its current operating procedures to assist FRANCHISEE in complying with FRANCHISOR's Standards; and

2.1.4     FRANCHISOR shall make available to FRANCHISEE such assistance in the pre-opening, opening and initial operation of the Unit as FRANCHISOR shall deem advisable, based upon FRANCHISEE's organization, prior experience and training.

*General Terms and Conditions*

Exhibit *A* Page *27*

**2.2**     **After the Initial Opening of the Unit.**

**2.2.1**     FRANCHISOR shall maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations; and

**2.2.2**     FRANCHISOR shall provide FRANCHISEE with FRANCHISOR's Standards for the authorized System(s), as the same may be modified by FRANCHISOR from time to time, in its sole and absolute discretion; and

**2.2.3**     FRANCHISOR shall continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all units; and

**2.2.4**     FRANCHISOR shall make reasonable efforts to disseminate FRANCHISOR's Standards to potential suppliers of products at the written request of FRANCHISEE, subject, however, to specific requirements and limitations of each authorized System.

### Section 3. Advertising and Promotion

**3.0**     FRANCHISOR has established and administers a marketing, advertising and sales promotion fund (the "Fund") for each of the Systems, and directs the development of all advertising, marketing and promotional programs for each System.  FRANCHISEE's payments to the Fund(s) shall be used for advertising, marketing, promotion, production and development of all advertising, marketing, promotional and other programs, product development, merchandising, public relations, administrative expenses, programs designed to increase sales and enhance and further the public reputation of FRANCHISOR and each applicable System, and activities related to any and all of the foregoing.  The content of all activities of the Fund(s), including, without limitation, the media selected and employed, as well as the area and units to be targeted for such activities, shall be at the sole discretion of FRANCHISOR.  FRANCHISOR undertakes no obligation to make expenditures for FRANCHISEE which are equivalent or proportionate to contributions paid under this Agreement or to insure that FRANCHISEE benefits directly or on a prorata basis from activities of the Fund(s), if any.  Upon request, FRANCHISOR will provide FRANCHISEE a statement of receipts and disbursements for any Fund to which FRANCHISEE contributes under the terms of this Agreement, prepared by an independent public accountant for each fiscal year of the Fund.

**3.1**     FRANCHISEE, prior to using any advertising or promotional material that FRANCHISEE has prepared for use in its local area, shall submit such material to FRANCHISOR for review and approval.  If written disapproval of the advertising and promotional material is not received by FRANCHISEE from FRANCHISOR within fifteen (15) days from the date such material is received by FRANCHISOR, said materials shall be deemed approved for use by FRANCHISEE, unless and until subsequently disapproved by FRANCHISOR, in which event FRANCHISEE will promptly discontinue any further use thereof.

**3.2**     FRANCHISEE acknowledges that this Agreement grants FRANCHISEE no right to use any of the Proprietary Marks to advertise products and/or services for order through the mail or by any electronic or other medium. FRANCHISEE shall not, without the prior written approval of FRANCHISOR, use any of the Proprietary Marks on the Internet or any similar electronic or other communications medium, to promote FRANCHISEE's business and/or advertise and/or sell products and/or services.  Notwithstanding the provisions of paragraph 3.1 above, FRANCHISOR's failure to disapprove any request to use the Internet or any similar electronic or other medium within fifteen (15) days shall not give FRANCHISEE the right to undertake such use.  FRANCHISOR shall have the sole right to establish an Internet "home page" using any of the Proprietary Marks, and to regulate the establishment and use of linked home pages by its franchisees.

**3.3**     Special Terms and Conditions for each System authorized for this Unit are attached to this Agreement and contain additional provisions related to advertising and promotion.

### Section 4. Payments

**4.0**     FRANCHISEE shall pay to FRANCHISOR the following initial charges and continuing fees:

**4.1**     **Initial Franchise Fee.** - FRANCHISEE shall pay FRANCHISOR an Initial Franchise Fee in the amount set forth in Item "C" of the Contract Data Schedule of this Agreement.  Unless the Initial Franchise Fee was prepaid under the terms of a Store Development Agreement, five thousand dollars ($5,000.00) shall be paid upon the execution of this Agreement and the remaining unpaid balance within ten (10) days after FRANCHISEE's receipt of FRANCHISOR's written approval of the Premises; provided however, if the Premises is developed by FRANCHISOR, the balance shall be due in full upon FRANCHISEE's execution of the Lease of the Unit, or on the date FRANCHISEE or the Designated Representative commences FRANCHISOR's training program, whichever date is earlier.

**4.2**     **Marketing Start-Up Fee.** - FRANCHISEE shall pay a Marketing Start-Up Fee in the amount set forth in Item "D" of the Contract Data Schedule of this Agreement, for a start-up promotional program or such other promotion or advertising program as FRANCHISOR may specify.  Payment shall be made in full prior to attendance by FRANCHISEE or the Designated Representative at FRANCHISOR's training program or thirty (30) days prior to the scheduled opening of the Unit, whichever date is earlier, and shall be nonrefundable after the Unit commences operations.

**4.3**     **Continuing Franchise Fees** - FRANCHISEE shall pay FRANCHISOR at Post Office Box 1097, Charlotte, North Carolina 28201-1097 (or to such other address as FRANCHISOR shall from time to time advise FRANCHISEE in writing), on or before Thursday of each week, a sum determined by multiplying the Gross Sales of the Unit for the seven (7) day period ending at the close of business on the preceding Saturday times the percentage set forth in Item "E" of the Contract Data Schedule of this Agreement.

*General Terms and Conditions*

Exhibit *A*  Page 28

-4-

4.4     <u>Continuing Advertising Fee.</u> FRANCHISEE shall also pay, at the same time, for the same seven (7) day period, in the same manner as, and in addition to the payments provided for under paragraph 4.3 above, the percentage set forth in Item "F" of the Contract Data Schedule of this Agreement, of the Gross Sales of the Unit, to one or more Funds for advertising, marketing, promotion and other purposes, as specified in Section 3 of this Agreement.

4.4.1     In addition, FRANCHISEE shall participate in and make additional payments to the Fund(s) with respect to all advertising, marketing, promotion and other programs of each authorized brand at the Unit, which from time to time are supported by two-thirds of the units of such brand in the market in which the Unit is located with respect to local programs, and in the continental United States, with respect to national programs.

4.4.2     If FRANCHISEE is authorized to use more than one (1) System at the Unit, fees payable under this paragraph 4.4 with respect to each System shall apply only to that portion of the Unit's Gross Sales which are applicable to that System, as determined by FRANCHISOR.

4.5     If any sales, income, excise, use or privilege tax is imposed or levied by any government or governmental agency on account of the payment of franchise or royalty fees by FRANCHISEE under this Agreement, FRANCHISEE shall pay FRANCHISOR a sum equal to the amount of such tax as an additional royalty fee (but this provision shall not apply to federal or state income taxes imposed upon FRANCHISOR).

4.6     FRANCHISOR shall have the right to require FRANCHISEE, upon written notice, to make payments under this Agreement by electronic funds transfer or to a lock-box located at an independent bank.  Acceptance of payment by electronic funds transfer or to a lock-box shall not be deemed a waiver of any rights of FRANCHISOR.  If FRANCHISOR establishes a direct debit program with FRANCHISEE's bank for the electronic payment of continuing franchise and advertising or sales promotion fees, FRANCHISEE must provide FRANCHISOR with all consents, authorizations and bank account data necessary to effect such electronic payment.

4.6.1     FRANCHISEE must complete and deliver to FRANCHISOR such forms as may from time to time be required to effectuate any changes as necessary to maintain EFT capability.  FRANCHISEE agrees (a) to give FRANCHISOR at least fourteen days written notice (except in the case of emergency) before making any change to FRANCHISEE's EFT bank account, providing all information and specimens required to change EFT to the new account; (b) to pay FRANCHISOR its then-current late fee, plus collection costs and reasonable attorney's fees, if FRANCHISEE's bank rejects FRANCHISOR's EFT request because of insufficient funds; and (c) upon demand, to replace EFT rejected by FRANCHISEE's bank with a bank certified or cashier's check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees.

4.6.2     For each week that FRANCHISEE (a) submits a weekly Gross Sales report via FRANCHISOR's approved electronic form over the Internet, and (b) pays the corresponding weekly continuing franchise and advertising fees by EFT, FRANCHISOR will deduct the fees from FRANCHISEE's bank account on or after the Thursday twelve (12) days after the Saturday of the week for which sales were reported.  This benefit will only become available after FRANCHISOR implements an electronic form for reporting weekly sales satisfactory to FRANCHISOR.  To have this benefit available, FRANCHISEE must have computer equipment capable of accessing and using the electronic form in the manner required. In FRANCHISOR's discretion or due to system failure, FRANCHISOR may elect to withdraw the electronic form.  In any such case, FRANCHISEE must immediately return to reporting Gross Sales in the manner originally required.

4.7     <u>Late Fee, Interest and Costs.</u> If any payment required under this Agreement is not paid when due, FRANCHISEE shall pay, in addition to the unpaid amount, FRANCHISOR's then-current late fee for each unpaid invoice. In addition, all amounts payable by FRANCHISEE to FRANCHISOR under any provision of this Agreement, if not paid when the same becomes due, shall bear interest from the date due until paid at the rate of one and one-half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less.  Entitlement to such interest shall be in addition to any other remedies FRANCHISOR may have.  Receipt of any check, draft or other commercial paper shall not constitute payment until all funds therefrom are collected by FRANCHISOR.  FRANCHISEE shall pay all collection charges, including reasonable attorney's fees, on dishonored checks.  At FRANCHISOR's request, dishonored and returned checks will be promptly replaced by FRANCHISEE by a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees, set forth in this Agreement.

## Section 5.  Covenants of FRANCHISEE

5.0     FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE's commitment to at all times operate the Unit in accordance with FRANCHISOR's Standards (as defined in Definitions paragraph "I"), in order to increase the demand for FRANCHISOR's products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons.  FRANCHISEE agrees to devote continuous best efforts to successfully develop, manage and operate the Unit and to enhance the goodwill of the Proprietary Marks authorized by this Agreement and the System(s) as a whole.

5.0.1     If, in any consecutive twelve (12) month period, FRANCHISEE shall receive two (2) or more notices to cure any default under this Agreement, FRANCHISOR shall have the right, in addition to all other remedies available, to require that FRANCHISEE (in lieu of any Designated Representative) devote full time to managing the day-to-day operation of the Unit.

Exhibit *A* Page *29*

5.0.2    FRANCHISEE agrees to operate the Unit in strict accordance with all of FRANCHISOR's Standards as they may be communicated to FRANCHISEE from time to time.  Standards shall be established for and distributed to franchisees generally and/or FRANCHISEE specifically, in such form and content as FRANCHISOR may from time to time in its sole discretion prescribe.  Standards are copyrighted and FRANCHISEE shall not at any time copy, duplicate, record or otherwise reproduce any materials, in whole or in part, which set forth the standards or other proprietary information, or otherwise make the same available to any unauthorized person.  FRANCHISEE shall at all times maintain the documents embodying the Standards at the Unit (or at FRANCHISEE's principal offices, if not the Unit) and shall ensure that such documents are kept current and up to date.  In the event of a dispute as to the contents of the Standards, the terms of the master copy(s) maintained by FRANCHISOR shall control.

5.0.3    FRANCHISEE acknowledges that complete uniformity may not be possible or practical throughout the System(s) and agrees that FRANCHISOR may from time to time vary Standards, as FRANCHISOR may deem necessary or desirable for the System(s) or the Unit.

5.1    **Unit Operations.** - FRANCHISEE shall keep the Unit open and in continuous normal operation for such hours as FRANCHISOR shall from time to time direct, provided, however, no longer than the maximum number of hours per day permitted by law, on all days, unless prior written approval is obtained from FRANCHISOR or unless FRANCHISOR otherwise directs in writing.  In connection therewith, but without limitation, FRANCHISEE further agrees as follows:

5.1.1    FRANCHISEE shall use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRANCHISOR.  All such items must conform to FRANCHISOR's Standards.  FRANCHISOR reserves the right to specify any item by brand.  FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to franchisees from time to time.

5.1.2    FRANCHISEE shall refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product storage, handling, preparation, packaging, merchandising, and delivery, or any other items of any kind, which do not meet FRANCHISOR's Standards.  Without limiting the generality of the foregoing, FRANCHISEE shall immediately rectify all hazardous situations, and immediately remove and destroy any and all hazardous products.  For purposes of the foregoing sentence, "hazardous situations" are those which have the potential to cause injury, illness or death, and "hazardous products" are products which are unfit for human consumption or which have the potential to cause injury, illness or death.

5.1.3    FRANCHISEE shall offer for sale all products that FRANCHISOR may, from time to time in its sole discretion, designate in writing as approved for sale at the Unit.  FRANCHISEE shall sell, distribute and deliver such products only in weights, sizes, forms and packages as are approved in writing by FRANCHISOR.  FRANCHISEE further agrees to discontinue offering for sale any product that FRANCHISOR may, at any later time, in its sole discretion, by written notice withdraw approval for sale at the Unit; and FRANCHISEE agrees to refrain from offering for sale any product or products which have not been designated in writing as approved by FRANCHISOR for sale at the Unit.  FRANCHISOR may disapprove FRANCHISEE's sale of any product(s) or FRANCHISEE's participation in any program(s), in the event FRANCHISEE fails to comply with operational Standards at the Unit.  FRANCHISEE shall have sole and complete discretion as to the price FRANCHISEE charges for all products.

5.1.4    FRANCHISEE shall maintain at all times a sufficient supply of approved products to meet the demand of FRANCHISEE's customers at the Unit.

5.1.5    FRANCHISEE shall purchase all food products, supplies, equipment and materials required for the operation of the Unit from FRANCHISOR or from suppliers who (a) demonstrate, to the reasonable satisfaction of FRANCHISOR, the ability to meet all of FRANCHISOR's Standards for such items, (b) possess adequate capacity and facilities to supply the needs of FRANCHISEE and other franchisees in the quantities, at the times and with the reliability requisite to an efficient operation, and (c) have been approved, in writing, by FRANCHISOR.  Prior to purchasing any items from any supplier not previously approved by FRANCHISOR, FRANCHISEE shall submit to FRANCHISOR a written request for approval of the supplier.  FRANCHISOR may require that samples from the supplier be delivered to FRANCHISOR or to a designated independent testing laboratory for testing prior to approval and use.  FRANCHISEE shall pay FRANCHISOR a fee not to exceed the actual cost of the test; provided, however, no fee shall be charged for the first test requested by FRANCHISEE in any calendar year.  This paragraph is subject to Special Terms and Conditions which contain additional provisions and limitations specific to the System(s) authorized for the Unit by this Agreement.

5.1.6    FRANCHISEE shall maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Unit and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by FRANCHISOR.  FRANCHISEE shall make no material alteration, addition, replacement or improvement in or to the interior or exterior of the Unit (including the parking lot and landscaped areas) without FRANCHISOR's prior written consent.

5.1.7    FRANCHISEE shall comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation.

-5-

Exhibit _A_ Page _30_

-6-

5.1.7.1   FRANCHISEE agrees to maintain as business records provided in subsection 5.2 below. and to furnish to FRANCHISOR within five (5) days after receipt of written demand therefor, copies of all customer complaints and notices, warnings, citations, inspection reports and other communications related to the Unit from public authorities. FRANCHISEE hereby authorizes any such public authority to provide FRANCHISOR with copies of such notices and/or communications.   If any suit, investigation or other legal proceeding related to FRANCHISEE's business should be commenced by or against FRANCHISEE, FRANCHISEE shall immediately notify FRANCHISOR thereof and keep FRANCHISOR continuously advised of the status of the matter.

5.1.8   FRANCHISEE shall manage the Unit at all times with at least two (2) individuals, one of whom must be FRANCHISEE, or a partner, shareholder or member of FRANCHISEE, either of whom must be the Designated Representative and both of whom must have successfully completed FRANCHISOR's training program.  Both individuals must have literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to satisfactorily complete FRANCHISOR's training program and to communicate with employees, customers, and suppliers.  If FRANCHISEE operates more than one unit, FRANCHISOR requires that each additional unit be managed by a Designated Representative approved by FRANCHISOR.

5.1.8.1   In the event of any resignation, termination, disability, death or other incapacity of the Designated Representative, FRANCHISEE shall notify FRANCHISOR in writing of the name of a qualified successor Designated Representative as soon as possible, but in no event later than two (2) months after such event.

5.1.8.2   FRANCHISEE shall hire, train and supervise efficient, competent and courteous employees of good character for the operation of the Unit and shall ensure that all such employees are trained in accordance with FRANCHISOR's training procedures.  FRANCHISEE is solely responsible for hiring and discharging employees of the Unit, and for setting their wages and terms of employment.  FRANCHISEE shall ensure that all employees whose duties include customer service have sufficient literacy and fluency in the English language to adequately serve the public in the Unit.  FRANCHISEE (or the Designated Representative, as specified by FRANCHISOR) shall attend, and FRANCHISEE shall require employees at the Unit to attend, such further training as FRANCHISOR shall from time to time reasonably require.  The cost of training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the Unit will be borne entirely by FRANCHISEE.   FRANCHISEE will bear the cost of all training programs except FRANCHISOR's initial training program referred to in paragraph 2.1.2 of this Agreement.

5.1.9   FRANCHISEE shall accurately report all Gross Sales to FRANCHISOR and implement all procedures recommended by FRANCHISOR to minimize employee theft.  FRANCHISEE further acknowledges and agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to FRANCHISOR based on Gross Sales pursuant to Section 4 of this Agreement and that accurate reporting of Gross Sales requires, among other things, compliance with all Standards related thereto and recording all sales at the time the product is delivered to the purchaser, including, without limitation, retail, wholesale and bulk discount sales, whether for cash, by redemption of gift certificates or coupons, or sales for which payment may be deferred.

5.2      **Books, Records and Reports.**  FRANCHISEE shall keep full, complete and accurate books and accounts with respect to the Unit, in accordance with generally accepted accounting principles and all requirements of law and in the form and manner prescribed below or as from time to time further prescribed by FRANCHISOR.  Commencing upon the opening of the Unit:

5.2.1   FRANCHISEE shall submit to FRANCHISOR, on or before Thursday of each week, on a standard form approved by FRANCHISOR, a signed statement of Gross Sales at the Unit for the seven (7) day period ending at the close of business on the preceding Saturday, along with all moneys required to be paid under Section 4 of this Agreement.

5.2.2   FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty-five (45) after the close of each of FRANCHISEE's calendar or fiscal month, a profit and loss statement of the Unit for said monthly period.

5.2.3   FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty five (45) days after the close of each applicable period, a profit and loss statement prepared in accordance with generally accepted accounting principles, along with a balance sheet (including a statement of retained earnings or partnership account) (i) for the first six (6) months of each of FRANCHISEE's fiscal year; and (ii) for the full twelve (12) months of each of FRANCHISEE's fiscal years.  FRANCHISOR shall have the right, in its sole discretion, to require FRANCHISEE to have such annual statements audited by an independent certified public accountant and submitted to FRANCHISOR within ninety (90) days after the close of each of FRANCHISEE's fiscal year.

5.2.4   FRANCHISEE shall submit to FRANCHISOR, at the times and in the form required, such other periodic reports and information as may from time to time be prescribed by FRANCHISOR.

5.2.5   FRANCHISEE shall preserve, in the English language and for the time periods set forth below, all books, tax returns, accounting records and supporting documents relating to the FRANCHISEE's business operations at the Unit (hereinafter called the "Records"), including but not limited to:
    a.  daily cash reports;
    b.  cash receipts journal and general ledger;
    c.  cash disbursements journal and weekly payroll register;
    d.  monthly bank statements, and daily deposit slips and canceled checks;
    e.  all business tax returns;
    f.  suppliers invoices (paid and unpaid);

*General Terms and Conditions*

g. dated cash register tapes (detailed and summary);
h. semi-annual balance sheets and monthly profit and loss statements;
i. weekly inventories;
j. records of promotion & coupon redemptions;
k. such other records and information as FRANCHISOR may from time to time request.

FRANCHISEE shall be permitted to preserve Records and submit reports electronically, in accordance with FRANCHISOR's Retail Information System ("RIS") and/or other requirements, or otherwise with the prior written approval of FRANCHISOR. During the term of this Agreement, FRANCHISEE shall preserve and make available to FRANCHISOR all Records for no less than the current fiscal year and the three (3) immediate-past fiscal years. For three (3) years after the date of any transfer of any interest in this Agreement, the transferor of such interest shall preserve and make available to FRANCHISOR all Records of its last three (3) fiscal years of operation under this Agreement. For a period of three (3) years after the expiration of the term of this Agreement (or after any earlier termination thereof) FRANCHISEE shall preserve and make available to FRANCHISOR all Records for the last three (3) fiscal years of FRANCHISEE's business operation at the Unit.

5.2.6    Retail Information System   FRANCHISEE shall record all sales at or from the Unit at the time of sale, in accordance with FRANCHISOR's procedures and on devices, the make, model and serial numbers of which have been individually approved in writing by FRANCHISOR. Such devices must record accumulated sales in a manner that cannot be turned back or reset, and must retain data in memory storage in the event of power loss. FRANCHISEE shall, at its sole cost and expense, upon notice from FRANCHISOR, purchase or lease and install a unit and/or network information technology system, including computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR for the Unit (hereinafter for convenience called "RIS"). The term "RIS" includes, without limitation, all hardware and software designated from time to time by FRANCHISOR and the data stored thereon by FRANCHISEE. Some or all components of RIS may be licensed to FRANCHISOR and used by FRANCHISEE as a sub-licensee. FRANCHISEE shall use RIS solely in connection with the operation of the Unit, in the manner specified by FRANCHISOR from time to time. FRANCHISEE shall comply with such requirements determined by FRANCHISOR from time to time regarding maintenance, training, storage and safeguarding of data, records, reports and other matters relative to RIS.

5.2.6.1  FRANCHISEE shall, at its sole cost and expense: (a) attend, and/or cause the Designated Representative and/or employees in the Unit to attend, such initial and other RIS training as is specified by FRANCHISOR; (b) maintain RIS in continuous operation at the Unit; (c) purchase an ongoing maintenance and support contract from an approved supplier and replace the RIS components as necessary, (d) upgrade RIS from time to time as may be reasonably required by FRANCHISOR; (e) permit FRANCHISOR immediate access to RIS, electronically or otherwise, at all times without prior notice to FRANCHISEE  (such access shall not unreasonably interfere with FRANCHISEE's normal Unit operations); and (f) install and maintain telephone or other service required by FRANCHISOR to permit such access.

5.2.6.2  FRANCHISEE shall, at its sole cost and expense, upon FRANCHISOR's request, replace RIS with the computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR from time to time as FRANCHISOR's then-current unit and/or network information system. Such replacements shall take place when deemed advisable by FRANCHISOR given the age, cost to operate, condition of the information system then in the Unit, the then-current and anticipated technology, the information systems then in use at other Units, the needs of the System(s), and other factors as may be relevant.

5.2.6.3  FRANCHISOR makes no representation or warranty as to the costs, sales, or profits, if any, which may result from the installation and use of RIS and its replacements.

5.2.7    FRANCHISOR shall treat any Records received from FRANCHISEE pursuant to this subsection 5.2 as confidential, except that information may be released (a) to any person entitled to the same under any Lease; (b) in connection with any court order, legal proceeding or other dispute resolution process, whether instituted by FRANCHISOR or any other party; (c) to a prospective transferee of any interest subject to the provisions of Section 10 of this Agreement, and (d) as incorporated into anonymous general information disseminated to FRANCHISOR's franchisees and prospective franchisees, and in the formulation of plans and policies in the interest of the System(s).

5.3    Insurance.  FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting FRANCHISEE and FRANCHISOR, its parent, subsidiaries and affiliates and their respective members, officers, directors, employees, agents, successors and assigns, against any loss, liability, including without limitation employment practices liability, or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with FRANCHISEE's operation of the Unit or by reason of FRANCHISEE's occupancy of the Premises.

5.3.1    Such policy or policies shall include:

5.3.1.1  commercial general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with a limit of two million dollars ($2,000,000.00) per occurrence and two million dollars ($2,000,000.00) in the aggregate or such higher limit as FRANCHISOR, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any Lease or underlying lease for the Unit, for bodily injury and property damage combined; and

5.3.1.2  "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the Premises and all other property within or relating to the Unit, including signs, with no coinsurance clause and with a replacement cost clause attached; and

-7-

*General Terms and Conditions*

Exhibit _A_ Page _32_

-8-

5.3.1.3  plate glass insurance and, if applicable, boiler insurance; and

5.3.1.4  employer's liability, worker's compensation and such statutory insurance as may be required in the state in which the Premises is located.

5.3.1.5  employment practices liability insurance with a limit of one million dollars ($1,000,000.00) per occurrence and one million dollars ($1,000,000.00) in the aggregate.

5.3.2    All insurance required under the terms of this Agreement (i) shall be written in the names of FRANCHISEE, FRANCHISOR and/or other party or parties designated by FRANCHISOR, as their respective interest may appear, by insurance companies reasonably acceptable to FRANCHISOR;  (ii) shall contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named;  (iii) shall provide that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named;  and (iv) shall not be limited in any way by reason of any insurance which may be maintained by FRANCHISOR or any other party named.

5.3.3    During the term of this Agreement, FRANCHISEE shall promptly unless otherwise directed by FRANCHISOR, (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish FRANCHISOR with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that all premiums have been paid.  If at any time FRANCHISEE fails to comply with the provisions of this subsection 5.3, FRANCHISOR, in addition to all other remedies available, shall have the right (but not the obligation) to obtain and/or maintain such insurance with respect to the Unit and/or Premises, at FRANCHISEE's sole expense. FRANCHISEE shall pay FRANCHISOR when and as billed for the cost of premiums therefor.  Maintenance of insurance and FRANCHISEE's performance of the obligations contained in this subsection 5.3 shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in paragraph 5.4 below.

5.3.4.   Each of the parties hereby waives any and all rights of recovery against the other parties hereto, or against the officers, employees, agents, and representatives of such other parties, for damage to such waiving party or for loss of its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damage.  FRANCHISEE shall, upon obtaining the policies of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Agreement.

5.4      **Indemnification.**  FRANCHISEE shall save, defend, exonerate, indemnify and hold harmless FRANCHISOR, its parent, subsidiaries and affiliates, or each of them, and their respective members, officers, directors, employees, agents, successors and assigns, from and against (i) any and all claims based upon, arising out of, or in any way related to the operation or condition of any part of the Unit or the Premises, the conduct of business thereupon, the ownership or possession of real or personal property and any negligent act, misfeasance or nonfeasance by FRANCHISEE or any of its agents, contractors, servants, employees, or licensees, and including, without limitation, all obligations of FRANCHISEE incurred pursuant to any provisions of this Agreement, and (ii) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of FRANCHISOR in the investigation of or defense against any and all such claims.

5.5      **Refurbishment & Remodel of the Premises.**  FRANCHISEE shall timely complete future refurbishments and remodels of the Unit in accordance with this subsection 5.5.  Such refurbishments and remodels are in addition to FRANCHISEE's continuing obligations to maintain, repair and replace all equipment, signage, furnishing, decor and personal property related to the Unit in accordance with FRANCHISOR's standards.  FRANCHISEE's obligations to maintain, repair and replace shall not be delayed or deferred pending or in anticipation of any such refurbishment or remodel.

5.5.1    No later than the Refurbishment Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall refurbish the Unit in accordance with FRANCHISOR's then-current refurbishment standards.   The refurbishment required of the FRANCHISEE shall be generally the same as then required of units of the same age and condition.  The above refurbishing costs do not include costs for required maintenance and repair or costs to upgrade, change or replace the Retail Information System.

5.5.2    No later than the Remodel Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall remodel the Unit in accordance with FRANCHISOR's then-current remodeling standards (including but not limited to fixtures, furnishings, signs and equipment).  The remodeling required of FRANCHISEE shall be generally the same as then required of units of the same age, condition, location and geographic region.

5.5.3    FRANCHISEE acknowledges and agrees that the requirements of this subsection 5.5 are both reasonable and necessary to ensure continued public acceptance and patronage of the System(s), to avoid deterioration or obsolescence of the Unit and to take advantage of changes and improvements in design, concept and decor.

5.6      **Cross-Guarantee.**  In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s).  Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its parent, subsidiaries and affiliates, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party.  FRANCHISEE's liability under this paragraph shall be limited to the extent                                    that                                         the

*General Terms and Conditions*

Exhibit *A*  Page *33*

total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE, held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

5.7   **FRANCHISEE Entity.** FRANCHISEE may be a sole proprietorship, a general partnership, a corporation or a limited liability company ("LLC"). FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein or approved by FRANCHISOR in writing.

5.7.1   **Corporation.** If FRANCHISEE is a corporation, (i) said corporation's charter shall provide that it is limited to operating the Unit as provided under this Agreement; (ii) all shareholders of the corporation shall enter into a written Agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the corporation's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new shares of common or preferred voting stock in the corporation shall be issued to any person, persons, partnership, association, LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all owners of record and all beneficial owners of any class of voting stock of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

5.7.2   **LLC.** If FRANCHISEE is an LLC, (i) said LLC's operating agreement shall provide that its activities are limited to operating the Unit as provided under this Agreement; (ii) all members of the LLC shall enter into a written agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the LLC's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) the LLC's operating agreement shall provide that any assignment or transfer of membership interests in the LLC is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new membership interest(s) in the LLC shall be created for, issued or granted to any person, persons, partnership, association LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all members of record of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

## Section 6.  Certain Rights of FRANCHISOR

6.0   In order to preserve the validity and integrity of the Proprietary Marks and to assure that the Standards of the System(s) are properly employed by FRANCHISEE in the operation of the Unit and, in general, to verify FRANCHISEE's compliance with the terms of this Agreement, FRANCHISOR, or its agents, shall have the right, at all times, with or without prior notice to FRANCHISEE, to enter and inspect any and all public or private area(s) of the Unit and to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the Standards of the System(s). During the course of any such inspection, FRANCHISOR may photograph or videotape any part of the Unit, whether or not FRANCHISEE is present. FRANCHISOR may require FRANCHISEE to remove any item which does not conform to applicable Standards. FRANCHISOR may also, at FRANCHISEE's expense, remove or destroy any item which does not conform to applicable Standards.

6.1   If FRANCHISOR finds any condition on the Premises which FRANCHISOR deems to be hazardous, unsafe, unhealthy, unsanitary, unclean or in material disrepair, FRANCHISOR shall have the following rights in addition to all other rights set forth in this Agreement:

6.1.1   FRANCHISOR shall have the right to require FRANCHISEE to immediately close and suspend operation of the Unit, and/or to require such other actions as FRANCHISOR, in its sole discretion, deems necessary, whenever there is reason to believe that any products in the Unit are contaminated, or for other reasons of imminent risk to public health and safety. FRANCHISEE agrees to notify FRANCHISOR immediately of any suspected product contamination or other violation affecting public health or safety and to promptly take any action which FRANCHISOR requires in connection therewith. FRANCHISEE shall be solely responsible for all losses, costs or other expenses it incurs in complying with the provisions of this subsection 6.1; and/or

6.1.2   FRANCHISOR shall have the right to immediately remove or destroy, at FRANCHISEE's expense, any product which FRANCHISOR believes to be hazardous, contaminated or to otherwise pose an imminent risk to public health or safety; or

6.1.3   FRANCHISOR shall have the right to give FRANCHISEE twenty-four (24) hours written notice requiring the correction of an unsafe, unhealthy, unsanitary or unclean condition, or thirty (30) days written notice requiring maintenance, repairs or alterations to the Unit or correction of any other Standards violation. If FRANCHISEE has not within that time corrected the condition or completed the maintenance, repairs or alterations, as the case may be, FRANCHISOR may enter the Unit, without being guilty of, or liable for, trespass or tort, and may cause the condition to be corrected or the maintenance, repair, or alteration to be completed at the expense of FRANCHISEE and without prejudice to any other rights or remedies of FRANCHISOR.

-9-

Exhibit _A_ Page _34_

-10-

6.2    In addition to FRANCHISOR's right to access information through the Retail Information System and otherwise, FRANCHISOR's representatives shall have the right to examine FRANCHISEE's original books, Records and supporting documents at reasonable times, and to perform, with or without notice to FRANCHISEE, such inspections, tests and other analyses as it deems appropriate to verify Gross Sales at the Unit.  If FRANCHISOR determines that the Gross Sales FRANCHISEE reported to FRANCHISOR are less than the Gross Sales ascertained by FRANCHISOR's analysis, FRANCHISEE shall immediately pay to FRANCHISOR all amounts owing to FRANCHISOR, the applicable Fund and FRANCHISOR's affiliated landlord corporation based upon the corrected Gross Sales.  If an analysis is undertaken due to (i) FRANCHISEE's failure to maintain the Retail Information System in continuous operation, or (ii) FRANCHISEE's failure to prepare, deliver or preserve statements or Records required by subsection 5.2 of this Agreement, or (iii) if any analysis of FRANCHISEE's books and Records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay, in addition to the unpaid amounts owed FRANCHISOR, its affiliated landlord corporation and the applicable Fund, interest thereon from the date payment was due, at 18% per annum or the highest permissible rate.  FRANCHISEE shall also reimburse FRANCHISOR for all related expenses, including, but not limited to, reasonable investigation, accounting and legal fees and other reasonable expenses and costs such as travel, payroll and overhead expenses for FRANCHISOR's employees.  Such payments shall be without prejudice to any other remedies FRANCHISOR may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

6.3    In the event that FRANCHISOR shall believe there may have been intentional under-reporting of Gross Sales for the Unit, FRANCHISEE (and all partners, members and shareholders of FRANCHISEE) shall, upon written demand from FRANCHISOR provide FRANCHISOR, in addition to Records described in paragraph 5.2.5, personal federal and state tax returns, bank statements (including deposit slips and canceled checks) and such other documents and information as FRANCHISOR may in its sole discretion request in connection with FRANCHISOR's efforts to verify Gross Sales reported to FRANCHISOR under this Agreement or any Lease of the Unit.  Information provided by FRANCHISEE under this paragraph 6.3 shall be subject to the confidentiality provisions of paragraph 5.2.7, except that exclusion (c) therein does not apply.  Schedules to personal tax returns and other financial data which are unrelated to the business of the Unit need not be provided by any partner, member or shareholder of FRANCHISEE who has not been active in the business, and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the business at the Unit, alone or in conjunction with any other family member or related entity.

6.4    FRANCHISEE hereby grants FRANCHISOR the right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby authorizes such parties to release records of FRANCHISEE's purchases and deliveries to FRANCHISOR, by electronic transfer or otherwise, at such times and places as FRANCHISOR shall request.

6.5    If, during the term of this Agreement or any extension or renewal thereof, FRANCHISEE directly or indirectly acquires ownership or control of the Premises, FRANCHISEE agrees to give FRANCHISOR prompt written notice of such ownership or control and to grant FRANCHISOR, under FRANCHISOR's standard Lease Option Agreement, the option to acquire a leasehold interest in the Premises in the event of default by FRANCHISEE under this Agreement or under any lease or mortgage relating to the Premises.  Said leasehold interest shall be for the remaining term of this Agreement, including any renewal, at "triple-net" fair market value rental for comparable properties and use in the area as mutually agreed by the parties, or, in the absence of agreement, as determined by arbitration.

### Section 7.  Proprietary Marks

7.0    FRANCHISOR has, in connection with its business and the business of its franchisees, the right to use the Proprietary Marks which are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin, including colors, and certain trade names, including but not limited to **Dunkin' Donuts**®, licensed by Dunkin' Donuts Franchising LLC and **Baskin 31 Robbins**® licensed by Baskin-Robbins Franchising LLC, both of which are registered as trademarks on the Principal Register of the United States Patent and Trademark Office.  FRANCHISEE's rights to use specific Proprietary Marks under this Agreement are set forth in the Special Terms and Conditions described in Item "J" of the Contract Data Schedule of this Agreement and attached hereto as a part hereof.

7.1    FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement.  FRANCHISEE shall not sublicense the Proprietary Marks.  FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

7.1.1    FRANCHISEE understands and acknowledges that FRANCHISEE's license to use any or all of the Proprietary Marks is non-exclusive and relates solely to the single location set forth in this Agreement.  FRANCHISEE further acknowledges that FRANCHISOR, in its sole discretion, has the right to operate or franchise other units and sales outlets and to grant other licenses in, and to, any or all of the Proprietary Marks, and to develop and establish other systems, products or services using the same or similar Proprietary Marks, or any other proprietary names and marks, and to grant licenses or franchises thereto, in each case at such locations and on such terms and conditions as FRANCHISOR deems acceptable, without providing any rights therein to FRANCHISEE.  FRANCHISEE further acknowledges the FRANCHISOR may license others to use the Proprietary Marks at locations and in ways that competes with FRANCHISEE and draws customers from the same area as the Unit.

*General Terms and Conditions*

Exhibit *A* Page 35

7.2     FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the Proprietary Marks. FRANCHISEE shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use any of the Proprietary Marks or any confusingly similar form or variation thereof in any place or jurisdiction outside the United States; nor shall FRANCHISEE assist any others to do so.

7.3     FRANCHISEE shall identify itself as the franchisee of the Unit in conjunction with any use of the Proprietary Marks, including, without limitation, uses on letterheads, invoices, order forms, receipts, and contracts. Upon the written request of FRANCHISOR, FRANCHISEE shall display a notice identifying the Unit as being independently owned and operated by FRANCHISEE, in such content and form and at such conspicuous locations on the Premises as FRANCHISOR may designate.

7.4     FRANCHISEE agrees to notify FRANCHISOR promptly of any litigation instituted by FRANCHISEE, or by any person, firm or corporation against FRANCHISEE, relating to the Proprietary Marks. In the event FRANCHISOR undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for FRANCHISOR, be necessary to carry out such defense or prosecution.

## Section 8.  Restrictions on FRANCHISEE's Activities

8.0     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall:

8.0.1     Divert or attempt to divert any business or customer of the Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and System(s);

8.0.2     Directly or indirectly contest or aid in contesting the right of FRANCHISOR or any prospective franchisee of FRANCHISOR to obtain a building permit, zoning variance or other governmental approval required for the development of another location as a unit franchised by FRANCHISOR.; or

8.0.3     Except with respect to the ownership or operation of additional units under Franchises granted by FRANCHISOR, own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type FRANCHISOR requires to be offered by FRANCHISEE at the Unit; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other unit operating under the same Proprietary Marks of FRANCHISOR. Either party to this Agreement, upon notice in writing to the other during the Post-Term Period, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities, by requesting that the matter be submitted to arbitration in accordance with Section 11 of this Agreement. In such event, the decision of the arbitrator shall be final and binding upon the parties. FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the dispute.

8.1     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination, neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall communicate or divulge to, or use for the benefit of any person, persons, partnership, association or corporation, any information or knowledge concerning the methods of constructing, equipping or operating units under any of FRANCHISOR's Systems and all other information or knowledge which FRANCHISOR deems confidential and which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the franchised business. Any and all information, knowledge, and know-how including, without limitation, drawings, materials, specifications, techniques, and other data, which FRANCHISOR designates confidential shall be deemed confidential for purposes of this Agreement. FRANCHISOR shall have the non-exclusive right to use and incorporate into FRANCHISOR's Systems, for the benefit of itself and other of FRANCHISOR's franchisees licensees and distributors, all modifications, changes, and improvements developed or discovered by FRANCHISEE or FRANCHISEE's employees or agents in connection with the franchised business, without any liability or obligation to the developer thereof.

8.2     The covenants contained in this Section 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity. If all or any portion of a covenant in this Section 8 is held unreasonable or unenforceable by a court, arbitration panel or other agency having valid jurisdiction in a decision to which FRANCHISOR is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Section 8.

8.3     FRANCHISEE acknowledges that FRANCHISOR shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified.

-11-

Exhibit *A* Page *36*

-12-

## Section 9. Default

9.0     FRANCHISEE shall be in default under this Agreement:

9.0.1   If FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or if such a petition is filed against and consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law should be instituted by or against FRANCHISEE, or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshall or constable; or

9.0.2   If FRANCHISEE is convicted of or pleads guilty or "nolo contendere" to a felony, a crime involving moral turpitude, or any other crime or offense that FRANCHISOR believes is injurious to the System(s), the Proprietary Marks or the goodwill associated therewith, or if FRANCHISOR has proof that FRANCHISEE has committed such a felony, crime or offense; or

9.0.3   If FRANCHISEE permits the use of the Unit or Premises for any illegal or unauthorized purpose, including, without limitation, palming off or substitution of products under the Proprietary Marks or other marks of FRANCHISOR; or

9.0.4   If any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder; or

9.0.5   If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any Lease, mortgage, equipment Agreement, promissory note, conditional sales contract or other contract materially affecting the Unit, to which the FRANCHISEE is a party or by which FRANCHISEE is bound, whether or not FRANCHISEE is a party thereto.

9.1     **Thirty Day Cure Period.** Except as otherwise provided in this Section 9, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within thirty (30) days after written notice of default from FRANCHISOR is delivered pursuant to paragraph 14 hereof.  Notwithstanding the foregoing, the following lesser periods shall apply under the circumstances described:

9.1.1   **Seven Day Cure Period.**  A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to FRANCHISOR any moneys owing to FRANCHISOR or to any Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in subsection 5.3 of this Agreement.

9.1.2   **24 Hour Cure Period.**  A twenty-four (24) hour cure period shall apply as provided in paragraph 6.1.3 to the violation of any law, regulation, order or Standard of FRANCHISOR relating to health, sanitation or safety;  or if FRANCHISEE ceases to operate the Unit for a period of forty-eight (48) hours without the prior written consent of FRANCHISOR, provided, however, that if the Unit is abandoned, no cure period shall apply.

9.1.3   **Cure on Demand.**  FRANCHISEE shall cure on demand all "hazardous situations" and remove and destroy on demand all "hazardous products" as set forth in paragraph 5.1.2.1 and shall cure any situation which poses an imminent risk to public health and safety as provided in subsection 6.1.

9.1.4   **No Cure Period.**  No cure period shall be available if FRANCHISEE is in default under any paragraph designated 9.0.1 through 9.0.4 above; or if FRANCHISEE abandons the Unit; or if FRANCHISEE intentionally under-reports Gross sales, falsifies financial data or otherwise commits an act of fraud with respect to FRANCHISEE's acquisition of this Franchise or its rights or obligations under this Agreement; or if FRANCHISEE's Lease for the Unit is terminated due to FRANCHISEE's default thereunder.  In addition, no cure period shall be available for any default if FRANCHISEE has received three (3) or more previous notices-to-cure for the same or a substantially similar default (whether or not FRANCHISEE has cured the same), within the immediately preceding twelve (12) month period.

9.2     **Statutory Cure Period.**  If a statute in the state in which the Premises is located requires a cure period for the applicable default which is longer than any cure period specified in this Section 9, the statutory cure period shall apply.

9.3     **Late Fee, Interest and Costs.**  If FRANCHISEE fails to cure a default within any applicable time period following notice set forth in subsection 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, without limitation, late fees, collection fees, interest at one and one-half percent (1.5%) per month, or the highest permissible rate, and reasonable investigation and attorneys' fees incurred by FRANCHISOR as a result of any such default or termination.  All such interest, damages, costs and expenses may be included in and form part of the judgment awarded to FRANCHISOR in any proceedings brought by FRANCHISOR against FRANCHISEE.

9.4     **Termination.**  If FRANCHISEE fails to cure any default within the applicable period following notice from FRANCHISOR, FRANCHISOR may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement.  Such termination shall be effective immediately upon receipt of a written notice of termination from FRANCHISOR.  Notwithstanding the foregoing, this Agreement shall immediately terminate upon the occurrence of any event set forth in paragraphs 9.0.1 through 9.0.4 or paragraph 9.1.4, without notice or opportunity to cure or notice of termination.  Upon any termination or expiration of this Agreement all right of FRANCHISEE to use the Proprietary Marks and the System(s) and to operate the Unit under the Proprietary Marks shall terminate and:

*General Terms and Conditions*

9.4.1    FRANCHISEE shall promptly pay FRANCHISOR all sums owing or accrued from FRANCHISEE to FRANCHISOR, the Fund, and any affiliated landlord entity, including interest and any damages, costs and expenses, including reasonable attorneys' fees, incurred by FRANCHISOR by reason of default on the part of FRANCHISEE; and

9.4.2    FRANCHISEE shall immediately cease to operate the Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of FRANCHISOR; and

9.4.3    FRANCHISEE shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the System(s), any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices which are part of FRANCHISOR's System(s) or are otherwise used in connection with the operation of the Unit. FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of FRANCHISOR's trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE; and

9.4.4    FRANCHISEE shall immediately return to FRANCHISOR all operating manuals, plans, specifications, and other materials in FRANCHISEE's possession containing information prepared by FRANCHISOR and relative to the operation of the Unit, and all copies thereof (all of which are acknowledged to be FRANCHISOR's property), and shall retain no copy or record of any of the foregoing, except FRANCHISEE's copy of this Agreement, any correspondence between the parties, and any other documents which FRANCHISEE reasonably needs for compliance with any provision of law; and

9.4.5    FRANCHISEE shall remove from the Premises and from any equipment, signs, trade fixtures, furnishings and other personal property (except as provided in paragraph 9.4.6 below) and return to FRANCHISOR, all of the Proprietary Marks or other indicia of FRANCHISOR, and shall disconnect, withdraw and/or terminate, within five (5) days after termination or expiration of this Agreement, any telephone listings and/or fictitious name registration containing any part of the Proprietary Marks.   Upon FRANCHISOR's written demand, however, FRANCHISEE shall assign to FRANCHISOR, upon any termination, expiration or non-renewal of this Agreement, any telephone number used in the operation of the Unit if such number is listed in the directory using any of the Proprietary Marks. FRANCHISEE hereby appoints FRANCHISOR as its attorney-in-fact, in the name of FRANCHISEE, to do any act necessary to effect the intent of this paragraph; and

9.4.6.    FRANCHISEE shall, but only in the case of any early termination of this Agreement due to FRANCHISEE's default, sell to FRANCHISOR, at FRANCHISOR's election, any or all of the equipment, interior and exterior signs, trade fixtures, furnishings and other personal property of FRANCHISEE used in connection with the Unit (hereinafter collectively "Equipment"), at the purchase cost when originally installed in the Unit, less a depreciation deduction computed on a straight line basis over a ten (10) year useful life for the respective items (but in no event less than ten percent (10%) of the original purchase cost for such equipment, fixtures and furnishings). If FRANCHISEE owes a balance due on its purchase or financing of such Equipment, or if the same are otherwise subject to a lien or claim for any indebtedness, the amounts of such balance and/or indebtedness shall be deducted from the purchase price payable to FRANCHISEE.   All sums of money due FRANCHISOR by FRANCHISEE may be offset against the purchase price payable to FRANCHISEE.   Nothing contained herein, however, shall be construed to entitle FRANCHISEE to be released from liability for such unpaid balance or indebtedness, if any, in excess of the portion of the purchase price applied for payment of such debts; and

9.4.7    FRANCHISEE shall, at FRANCHISOR's option by notice to FRANCHISEE within thirty (30) days from the date of termination or expiration, assign to FRANCHISOR any interest which FRANCHISEE has in the Lease or any other Agreement related to the Premises.   If FRANCHISOR does not elect to exercise its option to acquire the Lease, FRANCHISEE shall make such modifications or alterations to the Premises immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises from that of other units in the System(s), and shall make such specific additional changes thereto as FRANCHISOR may reasonably require for that purpose.  In the event FRANCHISEE fails or refuses to comply with the requirements of this paragraph 9.4.7, FRANCHISOR shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making such changes as may be required, at the expense of FRANCHISEE, which expense FRANCHISEE agrees to pay upon demand; and

9.4.8    FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, but not limited to, reasonable investigation and attorney's fees and other reasonable expenses and costs such as travel costs and payroll expenses for FRANCHISOR's employees, incurred in obtaining injunctive or other relief for the enforcement of any provisions of this Section 9; and

9.4.9    FRANCHISEE shall continue to comply with Section 8 of this Agreement, for the Post-Term Period specified therein.  If FRANCHISEE begins to operate any other business wherever situated, FRANCHISEE shall not use, in connection with such other business or the promotion thereof, any reproduction, counterfeit, copy or colorable imitation of any of FRANCHISOR's Proprietary Marks or trade dress; and FRANCHISEE shall not utilize any designation of origin or description or representation which falsely suggests or represent an association or connection with FRANCHISOR whether or not constituting unfair competition.

9.5    Nothing in this Agreement shall preclude FRANCHISOR from seeking any remedy under federal or state law for willful trademark infringement, including, without limitation, injunctive relief.  No right or remedy herein conferred upon or reserved to FRANCHISOR is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder.  FRANCHISEE agrees that the existence of any claims against FRANCHISOR, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by FRANCHISOR of any provision of this Agreement.

*General Terms and Conditions*


Exhibit *A* Page 38

-14-

9.6     Because the Unit is one of many units within the System(s) that sell similar products and services to the public, FRANCHISEE agrees that its failure to comply with the terms of this Agreement would cause irreparable damage to FRANCHISOR and the System(s) as a whole for which no adequate remedy at law may be available, including, without limitation, violations of standards, unhealthy, unsafe or unsanitary conditions, unauthorized use of the Proprietary Marks and breaches under Section 8 hereof. In the event of FRANCHISEE's breach or threatened breach of any of the terms of this Agreement, FRANCHISOR shall therefore be forthwith entitled to an injunction restraining such breach and/or to a decree of specific performance, without showing or proving any actual damage or irreparable harm or lack of an adequate remedy at law, and without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE, until a final determination is made by a court of competent jurisdiction. The foregoing remedy shall be in addition to all other remedies or rights which FRANCHISOR might otherwise have by virtue of any breach of this Agreement by FRANCHISEE.

## Section 10.  Transfer Provisions

10.0     **Transfer By FRANCHISOR.**  This Agreement shall inure to the benefit of the successors and assigns of FRANCHISOR either individually or collectively. FRANCHISOR shall each have the right to assign its rights under this Agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by FRANCHISOR herein and FRANCHISEE receives a statement from both FRANCHISOR and its transferee to that effect. Upon such assignment and assumption, FRANCHISOR shall be under no further obligation hereunder except for accrued liabilities if any.

10.0.1    If this Agreement now or hereafter grants FRANCHISEE rights with respect to more than one (1) brand, FRANCHISOR shall have the right, at any time and from time to time, to require FRANCHISEE to execute and deliver separate contracts for each brand, each containing all of the terms of this Agreement pertaining to such brand. FRANCHISEE agrees to execute and return such replacement contracts to FRANCHISOR within thirty (30) days after receipt thereof. If FRANCHISEE fails to do so, FRANCHISOR shall have the right to execute such instruments on FRANCHISEE's behalf and deliver a copy thereof to FRANCHISEE.

10.1     **Transfer By FRANCHISEE.**  FRANCHISEE understands and acknowledges that the rights and duties set forth in this Agreement are personal to FRANCHISEE and that FRANCHISOR has granted the Franchise in reliance on the business skill and experience, financial capacity and personal character of FRANCHISEE. Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any member, if FRANCHISEE is a limited liability company ("LLC"), nor any shareholder, if FRANCHISEE is a corporation, without FRANCHISOR's prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC or corporation, any interest in this Agreement, or any interest in the franchise granted herein, or any interest in any proprietorship, partnership, LLC or corporation which owns any interest in the franchise, nor offer, permit or suffer the same. Any purported assignment or transfer not having the prior written consent of FRANCHISOR shall be null and void and shall constitute default hereunder. Any proposed transfer must meet all the requirements of FRANCHISOR including, but not limited to, those set forth in this Section 10.

10.2     **Consent By FRANCHISOR.**  FRANCHISOR shall not unreasonably withhold its consent to any transfer referred to in paragraph 10.1 above, provided, that:

10.2.1    FRANCHISEE must have operated the Unit for a period of not less than six (6) months prior to the proposed transfer;

10.2.2    The sales price of the interest to be conveyed must not be so high, or the terms of sale so onerous, that, in the judgment of FRANCHISOR, the transferee will be unlikely to properly maintain, operate and promote the Unit and meet the transferee's financial and other obligations to FRANCHISOR, third party suppliers and creditors. This provision shall not create any liability to either transferor or transferee on the part of FRANCHISOR, in the event that FRANCHISOR approves the transfer and the transferee experiences financial difficulties;

10.2.3    The transferee and each partner, shareholder or member of the transferee, as the case may be, must be a United States citizen or lawful resident alien of the United States, must be of good moral character and reputation and must have a good credit rating and business qualifications and aptitude reasonably acceptable to FRANCHISOR. Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to communicate with employees, customers, and suppliers of FRANCHISOR and to satisfactorily complete FRANCHISOR's required training program and such other tests and interviews as FRANCHISOR shall reasonably deem to be necessary or desirable. FRANCHISEE shall provide FRANCHISOR with such information as FRANCHISOR may require to make a determination concerning each proposed transferee; and

10.2.4    The transferee may not be a limited partnership, trust or other entity not specifically authorized herein.

10.3     **Transfer Requirements.**  Each transfer of any interest in FRANCHISEE, the Unit, this Agreement and/or the Franchise herein granted, must receive the prior written consent of FRANCHISOR set forth in subsection 10.2 above and must conform to and/or comply with the following requirements:

10.3.1    Prior to the transfer, FRANCHISEE must pay and satisfy all accrued money obligations to FRANCHISOR, its affiliates and/or subsidiaries and to any Fund, obligations of FRANCHISEE which FRANCHISOR has guaranteed, liens, deferred rent and other obligations under the Lease for the Unit or other contracts pertaining to the Unit and the transfer fee provided below, as applicable;

*General Terms and Conditions*

Exhibit _A_ Page 39

10.3.2  Prior to the transfer, the Unit, including equipment, signs, building, improvements, interior and exterior, must be in good operating condition and repair and in compliance with FRANCHISOR's then-current Standards, including, without limitation, Standards for replacements and additions;

10.3.3  FRANCHISEE and any transferor may not assert any security interest, lien, claim or right now or hereafter in this Franchise, the Franchise granted to the transferee, or, if applicable, the Lease for the Unit with FRANCHISOR or its affiliated landlord entity.  Any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by FRANCHISOR, its successors or assigns;

10.3.4  Prior to the transfer, the transferee must comply with the requirements of paragraph 5.1.8 of this Agreement, to the satisfaction of FRANCHISOR;

10.3.5  If the transferee is a corporation or LLC, it must comply with the terms of subsection 5.7 of this Agreement;

10.3.6  The transferee, including, where appropriate, all shareholders, members and partners of the transferee, shall jointly and severally execute, on FRANCHISOR's then-current forms, a franchise agreement and all other standard ancillary agreements, including, without limitation, a priority in payment agreement, if applicable.  The priority in payment agreement provides, among other things, that if the transferee is unable at any time to make payments both to the transferor for the purchase of the Unit and to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s), payments to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s) will have priority.  The transferee's franchise agreement shall not increase any fee based upon a percentage(s) of Gross Sales to a percentage greater than as required by this Agreement for the respective System(s).  Unless a longer period is agreed upon between FRANCHISOR and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement.  The transferee shall pay no franchise fee pursuant to paragraph 4.1 of this Agreement unless a longer term is agreed upon by FRANCHISOR;

10.3.7  FRANCHISEE, including all individuals proposing to transfer an interest in the Franchise or the FRANCHISEE, must execute, on FRANCHISOR's standard form, a general release of all claims against the FRANCHISOR corporations, their affiliated corporations, and the directors, officers and employees of each; and

10.3.8  In addition, FRANCHISOR shall have the right to promulgate and enforce such additional reasonable requirements as it may, in its sole judgment determine.

10.4   **Transfer Fee.**  The transferor shall pay to FRANCHISOR upon any transfer of any interest of FRANCHISEE in this Agreement or of any interest in the FRANCHISEE entity, a Transfer Fee as forth in Schedule BR or DD, as applicable.

10.5   **Release of Transferor.**  Upon FRANCHISOR's approval of the transfer and FRANCHISEE's compliance with the aforesaid conditions, the transferor shall, provided that the transferor no longer has an interest in the Franchise, thereupon be relieved of further obligations under the terms of this Agreement, except that the transferor shall remain obligated for FRANCHISEE's money obligations under Section 4 through the date of transfer, and under the covenants contained in Section 8 for the Post Term Period therein described, after the date of transfer.

10.6   **Transfer on Death, Disability or Incapacity.**  In the event of the death, disability or mental incapacity of FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, at any time during the term of this Agreement, the legal representative of the deceased, disabled or incapacitated party, as the case may be, together with all surviving partners, members or shareholders of FRANCHISEE, if any, shall, within six (6) months of such death, disability or mental incapacity, jointly apply, in writing to transfer the Franchise or the interest of the affected party in such Franchise, to such person or persons as the legal representative may specify.  Such transfer shall be approved by FRANCHISOR upon fulfillment of all of the conditions set forth in Section 10 of this Agreement.  A Transfer Fee shall be due pursuant to subsection 10.4 above, except that paragraph 10.4.5 of Schedule BR or DD, as applicable, shall apply if the transferee is a beneficiary or heir of FRANCHISEE.

10.6.1  If the legal representative and all surviving partners, members or shareholders, if any, do not propose a transferee acceptable to FRANCHISOR under the standards set forth in this Agreement within the period set forth in paragraph 10.6 above, or if no transfer of the interest shall have been accomplished consistent with the provisions of this Section 10 within one (1) year from the date of death, disability or mental incapacity, all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to FRANCHISOR.  FRANCHISOR shall have the right and option, exercisable under such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld.  FRANCHISOR shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10.6.2  If the deceased, disabled or incapacitated party is the Designated Representative, then during the interim period until a transfer of the interest under this subsection 10.6 has taken place, the legal representative and surviving partners, members or shareholders shall operate the Unit through a successor Designated Representative who shall possess such qualifications for interim management of the Unit as FRANCHISOR may determine, in its discretion, from time to time.  Failure of FRANCHISEE or the legal representative to appoint a Designated Representative so qualified within ninety (90) days after the date of death, disability or mental incapacity of the Designated Representative shall be grounds for FRANCHISOR to terminate this Agreement after sending FRANCHISEE a thirty (30) day written notice to cure.

*General Terms and Conditions*

Exhibit *A* Page *40*

-16-

10.6.3  FRANCHISOR shall have the right to require a certified copy of an order of a court of competent jurisdiction over the estate of the deceased or incapacitated person, in which the legal representative or heir or legatee shall be determined, and may rely on such certified copy for the purposes of subsection 10.6.  If not furnished with such certified copy of a court order, or in the event of a legal contest, FRANCHISOR may decline, without liability, to recognize the claim of a party to such interest.  FRANCHISOR shall not be liable to any heir, next of kin, devisee, legatee, or legal representatives of a deceased or incapacitated person by reason of approval of a transfer of the interest to the surviving spouse or a child of the deceased, provided such approval is not contrary to an order of a court of competent jurisdiction served on FRANCHISOR.

10.7   **Right of First Refusal.**  If FRANCHISEE, or any shareholder, member or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's rights under this Agreement or any shareholder's, member's or partner's interest in the franchised business, FRANCHISEE or such shareholder, member or partner shall notify FRANCHISOR and provide it with a complete copy of such offer.  FRANCHISOR shall have the right and option, exercisable within sixty (60) days after its receipt of said copy, to purchase or assume and assign without recourse to a third party FRANCHISEE's Franchise, or such shareholder's, member's or partner's interest in the franchised business, on the same terms and conditions as offered by said third party.  FRANCHISOR's exercise of its rights hereunder shall not relieve FRANCHISEE of its Transfer Fee obligation to FRANCHISOR.  Should FRANCHISOR not exercise this option and the terms of the unaccepted offer be altered, FRANCHISOR shall, in each such instance, be notified of the changed offer and shall again have sixty (60) days to exercise its right to purchase on the altered terms.  Should FRANCHISOR not exercise this option, all of the terms of Section 10 shall apply to the transfer.

## Section 11. Arbitration.

11.0   Except as otherwise specified in this Section 11, all controversies, claims or disputes between FRANCHISEE and FRANCHISOR of whatever kind or nature, whether arising out of or relating to the negotiation, performance or breach of this or any other agreement or otherwise, must be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, as herein modified.  This provision encompasses all causes of action, whether nominally a "claim", "counterclaim" or "cross-claim", and whether arising under common law or any state or federal statute.  As used in this Section 11, the terms "FRANCHISOR" and "FRANCHISEE" include, without limitation, the past and present employees, agents, representatives, officers, directors, shareholders, members, guarantors, sureties, parent corporations, subsidiary corporations, controlled affiliated entities, predecessors, successors and/or assigns of each party hereto.  The parties intend that this provision be given the broadest possible interpretation by a court of law.

11.1   **Eligibility and Procedures.**  Arbitration must be initiated within the lesser of the time periods (a) set forth in paragraph 11.7.5 below or (b) permitted under the applicable statute of limitations for the cause of action asserted.  Any claim, controversy or dispute which is not so initiated within said lesser period shall not be eligible for arbitration under any circumstances.  Arbitration shall be initiated as provided in the Rules of the AAA by the filing of a demand for arbitration with the regional office of the AAA located in the city and state inserted in Item "L" of the Contract Data Schedule of this agreement.  If no location is inserted in Item "L" or if such insertion is incomplete or inaccurate, Boston, Massachusetts, shall be deemed to apply.  The arbitration proceedings, including without limitation all conferences, preliminary and dispositive hearings shall be conducted in such city and state unless all parties agree to another venue.  Actions to enforce an express obligation to pay moneys may be brought under the Expedited Procedures of the AAA's Commercial Arbitration Rules, provided there are no counterclaims.  The arbitrator(s) may issue such orders for interim relief as may be deemed necessary to safeguard the rights of the parties during the arbitration, but without prejudice to the ultimate rights of the parties, to the final determination of the dispute or to the rights of the FRANCHISOR to seek equitable relief from a court of competent jurisdiction at any time, even during the pendency of any arbitration proceedings initiated hereunder.

11.2   **Enforceability and Effect.**  Judgment on the award, including, without limitation, any interim award for interim relief, rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  The binding or preclusive effect of any award shall be limited to the actual dispute or claim arbitrated, and to the parties, and will have no collateral effect on any other dispute or claim of any kind whatsoever.

11.3   **Governing Law.**  The Federal Arbitration Act and related federal judicial procedure shall govern this contract to the fullest extent possible, excluding all state arbitration law, irrespective of the location of the arbitration proceedings, the nature of the dispute between the parties or the nature of the court in which any related judicial proceedings may be brought.  Except as provided in the preceding sentence respecting arbitration law, the resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles.

11.4   **Exceptions to Arbitration.**  Disputes concerning the validity or scope of this Section 11 (arbitration), including, without limitation, whether a dispute is arbitrable hereunder, shall be beyond the authority of the arbitrator(s) and shall be determined by a court of competent jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. §1 et seq., as amended from time to time.  In addition, the causes of action specified in the following subsections 11.5 and 11.6 are the sole and exclusive exceptions to the agreement of the parties hereto to resolve disputes through arbitration:

11.5   **FRANCHISOR's Exceptions.**  FRANCHISOR shall have the option to litigate any one or more of the causes of action specified in this subsection 11.5 and shall exercise said option by filing a complaint  in any court of competent jurisdiction:

11.5.1  the enforcement of an obligation to pay money to FRANCHISOR under an express term of any agreement;

11.5.2  any action based upon an allegation of intentional underreporting of Gross Sales by FRANCHISEE;

*General Terms and Conditions*

11.5.3   any action for declaratory or equitable relief, including, without limitation, seeking of preliminary and/or permanent injunctive relief, specific performance, other relief in the nature of equity or any action at law for damage to FRANCHISOR's property or property interests or in equity to enjoin any harm or threat of harm to FRANCHISOR's goodwill, Proprietary Marks or its tangible or other intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder;
11.5.4  any action seeking to terminate this Agreement based upon FRANCHISEE's material breach of paragraph 5.1.7 of this Agreement (excluding subparagraph 5.1.7.1); or

11.5.5  any action in ejectment or for possession of any interest in real or personal property.

11.6   **FRANCHISEE's Exceptions.**  FRANCHISEE shall have the option to litigate any cause of action otherwise eligible for arbitration hereunder and shall exercise said option solely by filing a complaint  in any court of competent jurisdiction in which FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages.  If any such complaint fails to include such express waivers or if any such court of competent jurisdiction determines that all or any part of such waivers shall be ineffective or void for any reason whatsoever, then the parties agree that the action shall thereupon be dismissed without prejudice, leaving the parties to their arbitration remedies, if then available pursuant to this Section 11.

11.6.1  In the event FRANCHISOR litigates any cause of action pursuant to subsection 11.5 above, FRANCHISEE shall not file any counterclaim, cross-claim, offset claim or the like against FRANCHISOR in the litigation, unless FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. Otherwise, FRANCHISEE shall submit each such counterclaim, cross-claim, offset claim or the like to arbitration, if then available pursuant to this Section 11.

11.7   **Waiver of Rights.**  THE PARTIES HERETO AND EACH OF THEM KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREE AS FOLLOWS:

11.7.1 The parties hereto and each of them EXPRESSLY WAIVE(S) THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY; and

11.7.2.   The parties hereto and each of them EXPRESSLY WAIVE(S) ANY CLAIM FOR PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES, except that FRANCHISOR shall be free at any time hereunder to bring an action for willful trademark infringement and, if successful, to receive an award of multiple damages as provided by law; and

11.7.3   The parties hereto and each of them EXPRESSLY AGREE(S) THAT NO PARTY BOUND HEREBY MAY RECOVER DAMAGES FOR ECONOMIC LOSS ATTRIBUTABLE TO NEGLIGENT ACTS OR OMISSIONS EXCEPT FOR CONDUCT WHICH IS DETERMINED TO CONSTITUTE GROSS NEGLIGENCE OR AN INTENTIONAL WRONG; and

11.7.4 The parties hereto and each of them EXPRESSLY AGREES THAT IN THE EVENT OF ANY FINAL ADJUDICATION OR APPLICABLE ENACTMENT OF LAW THAT PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES MAY NOT BE WAIVED, ANY RECOVERY BY ANY PARTY IN ANY FORUM SHALL NEVER EXCEED TWO (2) TIMES ACTUAL DAMAGES, except for an award of multiple damages to FRANCHISOR for willful trademark infringement, as provided by law.

11.7.5  ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR OR FRANCHISEE'S OPERATION OF THE UNIT, BROUGHT IN ANY FORUM BY ANY PARTY HERETO AGAINST THE OTHER, MUST BE COMMENCED WITHIN TWO (2) YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED, EXCEPT FOR FINANCIAL OBLIGATIONS OF FRANCHISEE.

11.8   **No Class Actions.**  No party shall initiate or participate in any class action litigation claim against any other party bound hereby, except that FRANCHISEE may initiate or participate in any class action arbitration claim by franchisees of FRANCHISOR against FRANCHISOR limited exclusively to alleged misappropriation of moneys from the Fund of any System authorized by this Agreement, which claim must be brought only in arbitration under the provisions of this Section 11.

11.9   **Post-Term Applicability.**  The provisions of this Section 11 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement, however effected.

## Miscellaneous Provisions.

12.0   **Relationship of the Parties.**  This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of FRANCHISOR or its parent, subsidiaries and affiliated entity(ies) for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of FRANCHISOR parent, subsidiaries or its affiliated entity(ies) or to create any obligation, express or implied, on behalf of FRANCHISOR parent, subsidiaries or its affiliated entity(ies).  The parties agree that this Agreement does not create a fiduciary relationship between FRANCHISOR or its affiliated entity(ies) and FRANCHISEE.

12.1   Under no circumstances shall FRANCHISOR or FRANCHISEE be liable for any act, omission, debt or other obligation of the other party.  Each party shall indemnify, protect, defend and save the other party harmless against any such claim.  The cost of defending against any claim arising directly or indirectly from, or as a result of, or in connection with FRANCHISEE's operation of the Unit shall be borne by FRANCHISEE.

-17-


Exhibit *A* Page 42

-18-

13.0    **Non-Waiver.** Any failure of FRANCHISOR to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any term, covenant or condition in this Agreement, and any waiver by FRANCHISOR of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement. Subsequent acceptance by FRANCHISOR of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by FRANCHISOR of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement. FRANCHISOR may, in its sole discretion, waive or modify any obligation of other franchisees under agreements similar to this Agreement, and no such waiver or modification shall obligate FRANCHISOR to grant a similar waiver or modification to FRANCHISEE. Acceptance by FRANCHISOR of payments due under this Agreement from any other person or entity shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee of or successor to FRANCHISEE.

14.0    **Notices.** All notices hereunder by FRANCHISOR to FRANCHISEE shall, at FRANCHISOR's option, be personally delivered or sent by telecopier, prepaid private courier or certified mail to the FRANCHISEE at the address set forth in Item "I" of the Contract Data Schedule of this Agreement or to such other address as FRANCHISEE may from

time to time give notice of to FRANCHISOR. If delivery is refused, proof of attempted delivery shall be deemed delivery. All notices hereunder by FRANCHISEE to FRANCHISOR shall be sent by certified mail to FRANCHISOR at 130 Royall Street, Canton, MA  02021, Attention: Senior Vice President and General Counsel or to such other address as FRANCHISOR may from time to time give notice to FRANCHISEE by email, regular mail or any other means set forth above.

15.0    **Entire Agreement.** This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between FRANCHISOR and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing. Captions, paragraph designations and section or subsection headings are included in this Agreement for convenience only, and in no way define, limit, construe or describe the scope or intent of the respective parts of this Agreement. The Special Terms and Conditions attached to this Agreement supplement the General Terms and Conditions and are intended to be additional thereto. In the event of any conflict between any provisions thereof, the provisions of the Special Terms and Conditions shall be deemed to prevail.

16.0    **Severability.** Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation of or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement.

17.0    **Applicable Law.** This Agreement shall be deemed to have been made in, and shall be interpreted, construed and governed by the laws of, the Commonwealth of Massachusetts. FRANCHISEE acknowledges that this Agreement is to be performed in part through services rendered to FRANCHISEE in Massachusetts.

18.0    **Independent Investigation.**  THE PROSPECT FOR SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE BY VIRTUE OF THIS AGREEMENT IS SPECULATIVE AND DEPENDS TO A MATERIAL EXTENT UPON FRANCHISEE'S CAPABILITY AS AN INDEPENDENT BUSINESS PERSON AND FRANCHISEE, AS WELL AS OTHER FACTORS.  FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE HEREBY.  FRANCHISEE REPRESENTS AND WARRANTS THAT IT HAS ENTERED INTO THIS AGREEMENT AFTER MAKING INDEPENDENT INVESTIGATIONS OF FRANCHISOR'S BUSINESS, AND NOT IN RELIANCE UPON ANY REPRESENTATION BY FRANCHISOR AS TO SALES OR PROFITS WHICH FRANCHISEE IN PARTICULAR MIGHT BE EXPECTED TO REALIZE.  FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES, EMPLOYEES OR AGENTS HAVE MADE NO REPRESENTATIONS TO INDUCE FRANCHISEE TO ACQUIRE THIS FRANCHISE AND EXECUTE THIS AGREEMENT WHICH ARE NOT EXPRESSLY SET FORTH HEREIN OR IN THE DISCLOSURE MATERIALS PROVIDED TO FRANCHISEE PRIOR TO ENTERING INTO THIS AGREEMENT.

19.0    FRANCHISEE acknowledges receiving a copy of this Agreement, the attachments thereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. FRANCHISEE further acknowledges receiving, on the date of the first personal meeting between FRANCHISOR and FRANCHISEE and not less than ten (10) business days prior to the date on which this Agreement was executed, the disclosure documents required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures".

Exhibit *A* Page 43

### SPECIAL TERMS AND CONDITIONS APPLICABLE TO A
### BASKIN-ROBBINS FRANCHISE

In connection with its business and the business of its Baskin-Robbins franchisees, BASKIN-ROBBINS has the right to use and control the usage of certain proprietary interests, trademarks, logos, emblems and other indicia of origin, service marks and trade names, including, without limitation, *Baskin 31 Robbins*®, which is registered as a trademark on the Principal Register of the United States Patent and Trademark Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of the Baskin-Robbins System and Proprietary Marks, desires to make use of the trademark *Baskin 31 Robbins*®, and to enjoy the benefits of that mark, the other Proprietary Marks and the Baskin-Robbins System. FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality, cleanliness, appearance and service to the value of the Baskin-Robbins System and the necessity of opening and operating FRANCHISEE's Baskin-Robbins Unit in conformity with the Baskin-Robbins System and in accordance with FRANCHISOR's Standards and specifications.

### DEFINITIONS

As used in these Special Terms and Conditions applicable to a Baskin-Robbins Franchise, the following defined terms shall have the following meanings:

A.   The "Baskin-Robbins Unit" is all or a portion of the Premises dedicated to the operation of the Baskin-Robbins System, as approved by FRANCHISOR.

B.   "Baskin-Robbins Products" mean and refer to ice cream, ice milk, sherbets, water ices, yogurts, frozen desserts, syrups, toppings, confections, novelties, food, beverages and fountain ingredients, all of a variety of kinds or flavors, made in accordance with the formulas or specifications designated by BASKIN-ROBBINS and identified by the Baskin-Robbins Proprietary Marks.

C.   "Associated BR Products" mean and refer to such other products and supplies as may be specified from time to time in writing by FRANCHISOR for sale in the Baskin-Robbins Unit.

### Section BR-1.  Grant Of The Franchise

1.0   BASKIN-ROBBINS grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a Franchise to operate an ice cream and yogurt store utilizing the Baskin-Robbins System in accordance with the terms, covenants and conditions of this Agreement, at one location only, the Premises described in Item "A" of the Contract Data Schedule of this Agreement (hereinafter called the "Baskin-Robbins Unit"). In connection therewith, this Franchise includes the right to use at the Baskin-Robbins Unit only, the trademark *Baskin 31 Robbins*®, along with other Proprietary Marks owned by BR IP Holder LLC and utilized by BASKIN-ROBBINS in connection with other Baskin-Robbins units, and the right to use at the Unit only, the Baskin-Robbins System including confidential and valuable information which now exists or may be acquired hereafter and set forth in FRANCHISOR's manuals or as otherwise from time to time disclosed to Baskin-Robbins franchisees.

1.0.7   FRANCHISEE will hire, at your own cost, an approved third-party development agent to provide project management and other services in connection with the selection and development of the Premises.

### Section BR-2.  Scope Of The Franchise

2.0   This Baskin-Robbins Franchise is specific to one location only, for the term of this Agreement. It grants no rights outside the Premises, nor includes any territorial protection against competition. FRANCHISOR reserves and retains the right to operate or permit others to operate Baskin-Robbins units or to sell or distribute Baskin-Robbins Products and/or services or to otherwise use the Baskin-Robbins Proprietary Marks and/or the Baskin-Robbins System, in each case at any other location. FRANCHISOR and other franchisees may compete for customers drawn from the same area as FRANCHISEE's Baskin-Robbins Unit using the same or different brand(s).

2.1.2 FRANCHISOR shall make available to two individuals designated by FRANCHISEE, one of whom must be a party to or guarantor of this Agreement FRANCHISOR's then current initial training program with respect to the operation of the Unit, at one or more of FRANCHISOR's Training Centers located in Massachusetts, California and/or at such other training facility as FRANCHISOR may, from time to time, designate.   If you area new franchisee and you are entering the system through an acquisition of an existing location or you need to have additional individuals attend training, you will need to pay an Initial Training Fee (see GTC 10.4.6 below).

2.2.4   Baskin-Robbins Products will be supplied to FRANCHISEE by BASKIN-ROBBINS, or one or more suppliers approved by BASKIN-ROBBINS.

### Section BR-3.  Advertising and Promotion

Exhibit *A* Page 44

3.0 FRANCHISOR shall prepare and coordinate a "Start-Up" promotional program (or such other promotional advertising program as FRANCHISOR may specify) for the initial opening of the Baskin-Robbins Unit.

3.1 FRANCHISOR shall review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Baskin-Robbins Unit; and

3.3.1 FRANCHISOR shall administer The Baskin-Robbins Advertising and Sales Promotion Fund (the "Baskin-Robbins Fund") and shall oversee all Baskin-Robbins System and product marketing, advertising and promotion, with sole discretion to approve or disapprove the creative concepts, materials and media used in the same, and the placement and allocation thereof. That portion of FRANCHISEE's payments under paragraph 4.4 of this Agreement equal to one percent (1%) of the Gross Sales of the Baskin-Robbins Unit will be utilized, at the discretion of FRANCHISOR, to provide for the administrative expenses of the Baskin-Robbins Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of BASKIN-ROBBINS and the Baskin-Robbins System. The balance, including any interest earned by the Baskin-Robbins Fund, will be used for advertising and related expenses. Contributions to the Baskin-Robbins Fund in excess of the percentage of Gross Sales of the Baskin-Robbins Unit set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate.

3.3.2 In addition to its other obligations under this Section BR-3, FRANCHISEE shall participate in all sales promotion programs as required from time to time by FRANCHISOR. Without limiting the foregoing, FRANCHISEE must redeem, for products, gift certificates, coupons, and vouchers distributed by FRANCHISOR, including, without limitation, unexpired gift certificates, coupons and vouchers issued by any previous franchise operating a Baskin-Robbins Unit at the Premises. All coupons or other promotions in which FRANCHISEE participates shall bear the expiration date thereof.

3.3.3 FRANCHISOR may, from time to time in its sole discretion, initiate one or more mandatory Maximum Price Promotional Campaigns for products or services designated by FRANCHISOR. A material aspect of these campaigns will be FRANCHISOR's right to establish the maximum price that FRANCHISEE can charge customers for the designated product(s) or service(s) during the promotional period. FRANCHISEE agrees to participate in each such campaign and, for the duration of the promotional period, FRANCHISEE will charge customers no more than the maximum price established by FRANCHISOR for the designated product(s) and/or service(s). FRANCHISEE retains the right to charge customers less than any maximum retail price FRANCHISOR may establish.

## Section BR-4. Payments

4.4 FRANCHISEE shall make payments to the Baskin-Robbins Fund as set forth in paragraph 4.4 of the General Terms and Conditions. FRANCHISOR reserves the right in its sole and absolute discretion to designate or change the composition of Baskin Robbins units included in the base for purposes of determining "two-thirds" support.

## Section BR-5. Covenants of FRANCHISEE

5.0 FRANCHISEE understands and acknowledges that every detail of the Baskin-Robbins System is important to BASKIN-ROBBINS, to FRANCHISEE and to other Baskin-Robbins franchisees, in order to maintain high and uniform standards of quality, cleanliness, appearance, service, products and procedures and thereby increase the demand for Baskin-Robbins Products and protect and enhance the reputation and goodwill of BASKIN-ROBBINS.

5.1.4 FRANCHISOR or its designated supplier shall not be liable to FRANCHISEE, or be deemed in breach or default of any obligation contained in this Agreement, for any delay or failure of delivery for any cause beyond its reasonable control, including, without limitation, difficulties of supply occasioned by war, law, weather conditions, acts of God, regulations or order of public authority, labor troubles or shortages of materials. If BASKIN-ROBBINS or its designated supplier shall not be able to supply the full requirements of all Baskin-Robbins Units, FRANCHISOR or its designated supplier shall endeavor to apportion available Baskin-Robbins Products and Associated BR Products equitably among them.

5.1.5.1 FRANCHISEE agrees to purchase from BASKIN-ROBBINS or its designated supplier all of the Baskin-Robbins Unit's requirements for the Baskin-Robbins Products specified by FRANCHISOR from time to time in the Standards, at BASKIN-ROBBINS' or its designated supplier's prices at the time of delivery. Such Baskin-Robbins Products will be of the variety of kinds and flavors which from time to time are selected by FRANCHISOR for supply to Baskin-Robbins franchisees. FRANCHISOR or its designated supplier may change, at any time and from time to time without prior notice, its prices for the sale and delivery of any Baskin-Robbins Products.

5.1.5.2 FRANCHISEE agrees to place its orders with FRANCHISOR or its designated supplier for Baskin-Robbins Products to be supplied by BASKIN-ROBBINS or its designated supplier at such times and in such manner as from time to time prescribed by FRANCHISOR. FRANCHISOR or its designated supplier will deliver such orders to FRANCHISEE in accordance with regular route schedules and times of delivery established by FRANCHISOR or its designated supplier from time to time, including during non-business hours of FRANCHISEE, in its sole discretion. FRANCHISEE agrees upon receipt of notice of the scheduled delivery time, to provide FRANCHISOR or its designated supplier with a means of access to the Unit's frozen storage facility for the purpose of such delivery, by providing FRANCHISOR or its designated supplier with a key to the Unit, or by having an agent present to open the Unit, or by other appropriate arrangements made with FRANCHISOR or its designated supplier. FRANCHISEE will also provide adequate freezer and other storage space to permit delivery of Associated BR Products required by FRANCHISOR in connection with the Baskin-Robbins Franchise. FRANCHISEE acknowledges that late orders by FRANCHISEE cause additional administrative expenses to FRANCHISOR or its designated supplier. FRANCHISEE agrees that FRANCHISOR or its designated supplier may, in its discretion, refuse to process a late order or impose a reasonable late charge or additional delivery expense charge, and add such charge to the next invoice payable by FRANCHISEE.

5.1.5.3 FRANCHISEE agrees to pay for all Baskin-Robbins Products which it purchases from BASKIN-ROBBINS or its designated supplier on such terms and conditions as BASKIN-ROBBINS or its designated supplier may from time to

*Baskin-Robbins Rider - pg 2*

*time specify. Should FRANCHISEE* fail to make timely payment, FRANCHISOR shall have the right, upon notice to FRANCHISEE, to require cash or cash equivalent on or in advance of delivery.

5.1.5.4  In the event of a default by FRANCHISEE in its payment obligations under this Agreement, or in payment of rent under the Lease, if applicable, or any other agreement with FRANCHISOR, BASKIN-ROBBINS or its designated supplier shall have the right, in addition to any other remedies, without notice, to discontinue the sale or delivery of any Baskin-Robbins Products to the Unit and to any other Baskin-Robbins unit in which FRANCHISEE or any of its shareholders, members or partners has an interest, until the next regularly scheduled delivery date following the date on which FRANCHISOR or its designated supplier has received payment in full of all of FRANCHISEE's outstanding invoices for Baskin-Robbins Products, rent and any other payment(s) due under this Agreement or the Lease, if applicable or any other agreement with FRANCHISOR.

5.1.5.5  FRANCHISEE acknowledges and agrees that BASKIN-ROBBINS or its designated supplier has the exclusive right to supply FRANCHISEE Baskin-Robbins Products.

5.1.5.6  FRANCHISEE shall purchase all Associated BR Products used or offered for sale by the Baskin-Robbins Unit solely from suppliers, manufacturers, distributors, and other sources who are currently approved by FRANCHISOR.

### Section BR-7.  Proprietary Marks

7.0      FRANCHISEE acknowledges and agrees that Baskin 31 Robbins® is a registered trademark licensed by BASKIN-ROBBINS; that said mark has been and is being used by BASKIN-ROBBINS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently licensed by BASKIN-ROBBINS or which may be acquired in the future, constitutes part of the BASKIN-ROBBINS System; that valuable goodwill is associated with and attached to said mark and the other BASKIN-ROBBINS Proprietary Marks; and that any and all goodwill associated with the BASKIN-ROBBINS Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of BASKIN-ROBBINS and/or the licensor of the marks.

7.5      FRANCHISEE shall operate, advertise, and promote the Baskin-Robbins Unit under the name "Baskin-Robbins," with no accompanying words or symbols of any nature except as may be otherwise required by law or designated by FRANCHISOR. FRANCHISEE shall not use, as part of its corporate or other business name, any Proprietary Marks used by FRANCHISOR, including, but not limited to, "Baskin-Robbins", "Baskin" or "Robbins", or any form or variations thereof, including, but not limited to, "B.R.," which, in the judgment of FRANCHISOR, is likely to cause third parties to be confused or mistaken with respect to the separate identities of BASKIN-ROBBINS and FRANCHISEE.

### Section BR-9.  Default

9.4   Termination - Upon any termination or expiration of this Agreement:

9.4.6.1  FRANCHISEE shall further and immediately sell to FRANCHISOR (who hereby agrees to purchase) all of FRANCHISEE's unopened and unexpired Baskin-Robbins Products and such unopened and unexpired Associated BR Products as bear any of the Proprietary Marks, at FRANCHISEE's purchase cost.

### Section BR-10.  Transfer

10.4      Transfer Fee. The transferor shall pay to FRANCHISOR upon any transfer of any interest of FRANCHISEE in this Agreement or of any interest in the FRANCHISEE entity, a Transfer Fee determined as follows:

10.4.1  Transferor shall pay to FRANCHISOR a Transfer Fee which is the greater of: (i) seven thousand five hundred dollars ($7,500.00), increased by five percent (5%) compounded annually during the term FRANCHISEE has operated the Unit under this or other agreements with FRANCHISOR; or (ii) five percent (5%) of the Adjusted Sales Price of the Unit.

10.4.1.1  The term "Adjusted Sales Price" shall mean the sales price to be received by FRANCHISEE upon transfer of the Unit, less the amount, if any, paid by FRANCHISEE for the Unit, when purchased as an ongoing business from another franchisee or from FRANCHISOR. No adjustment shall be made for amounts paid in connection with the development of a new unit. The Adjusted Sales Price shall include, without limitation, cash, assumption of debt, equipment lease obligations and deferred financing and amounts allocated to property of every kind, nature and description: furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building, if owned by FRANCHISEE. It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the contract of sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

10.4.1.2  For purposes of determining the correct Transfer Fee, FRANCHISOR reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise, if in FRANCHISOR's opinion, the allocation of the parties is unreasonable in relation to the value of the business. If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. of the Agreement, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

*Baskin-Robbins Rider - pg 3*

*10.4.3   If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. of the Agreement, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.*

*10.4.4   Transfer of Less Than Control.  For any transfer that, either alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, will have the result of the transferee(s) holding an aggregate interest of less than fifty percent (50%) of the franchise licensed herein or the entity licensed hereunder, FRANCHISOR will reduce the Transfer Fee set forth in paragraph 10.4.1 or 10.4.2, as applicable, to a fixed transfer documentation fee of one thousand dollars ($1,000), increased after each five (5) years of the term of this Agreement, including any renewal period, by the same percentage as the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the same period.  FRANCHISOR will waive the Transfer Fee entirely with respect to a transfer of less than control, if each transferee was an approved party to (or personal guarantor of) this Agreement prior to transfer.*

*10.4.5   Transfer to Spouse or Children.  Notwithstanding anything else contained in this subsection 10.4, but provided that FRANCHISOR determines that FRANCHISEE has been in full compliance with the terms of all agreements with FRANCHISOR and its affiliates, the Transfer Fee due in connection with a transfer of the Unit to FRANCHISEE's spouse or one or more of FRANCHISEE's children shall be the fixed transfer documentation fee described in paragraph 10.4.4 above.  The franchise agreement issued to the spouse and/or children will be on the then-current form in use at the time of transfer including the then-current Transfer Fee provisions.*

*10.4.6   Training Fee for Transfers/Additional Training.  If you are a new franchisee and you are entering the system through an acquisition of an existing location or you need to have additional people attend training and their training is not covered under any other agreement with us, you will pay the Initial Training Fee forth in the Contract Data Schedule.  This fee will cover the cost of the following:  Mystery Shopper (1 year subscription), Pink book (1 year subscription), On-line University (1 year subscription), Store Operations Manual, Desserts Operations Manual, RFSS Manual, ROR Manual, HAZCOM Manual, Dunkin Brands Inc. Emergency Contacts Wall Poster, and Coliform Kit (1 year supply).*

SPECIAL TERMS AND CONDITIONS APPLICABLE TO
A BASKIN-ROBBINS FRANCHISE

PROVISIONS APPLICABLE TO A SINGLE-BRAND BASKIN-ROBBINS UNIT

1.0.1     The first five words of paragraph 1.0.1 of the General Terms and Conditions are changed from *"FRANCHISEE and its Designated Representative"* to *"FRANCHISEE or its Designated Representative"*. FRANCHISEE must attend such training for the first unit owned by FRANCHISEE; training for each subsequent unit may be attended by a Designated Representative.

5.1.8   Paragraph 5.1.8 of the General Terms and Conditions is deleted from the Agreement in its entirety and replaced with the following:

> "The Unit shall at all times be managed by at least one individual who has successfully completed FRANCHISOR's training program. Such person must have literacy and fluency in the English language sufficient, in the good faith opinion of FRANCHISOR, to satisfactorily complete FRANCHISOR's training program and to communicate with employees, customers, and suppliers.  If FRANCHISEE operates more than one unit, FRANCHISOR requires that each additional unit be managed by a Designated Representative approved by FRANCHISOR."

082400
RIDER TO FRANCHISE AGREEMENT

PC #331308

## ADDITIONAL TERMS AND CONDITIONS APPLICABLE TO
## A BASKIN-ROBBINS FRANCHISE PURSUANT TO
## THE BASKIN-ROBBINS FRANCHISE ROYALTY CONVERSION OFFER

Notwithstanding anything to the contrary contained in the Franchise Agreement's General Terms and Conditions, Special Terms and Conditions or other schedule relating thereto, the following terms and conditions are hereby incorporated into the Franchise Agreement, consistent with the terms of the Baskin-Robbins Franchise Royalty Conversion Offer (the "Offer") previously executed by FRANCHISOR and FRANCHISEE, or FRANCHISEE's predecessor in interest.

1. <u>Wholesale Pricing Mechanism</u>: Exhibit II to the Offer, entitled "Wholesale Pricing Mechanism", is attached hereto as Exhibit A and is hereby incorporated into the Franchise Agreement as if the text were set forth fully herein.

2. <u>Retail Information System</u>: After the word "install" on line 5 of paragraph 5.2.6 of the General Terms and Conditions, the following is inserted: "(and exclusively use)". In addition, after the word "FRANCHISOR" in subsection (d) of paragraph 5.2.6.1 of the General Terms and Conditions, the following is inserted: "(but replacement will not be required sooner than three (3) years after FRANCHISEE initially installs RIS)".

3. <u>Late Fees, Interests and Costs</u>:  The words "or rejected EFT" are hereby inserted after the words "dishonored checks" on line 8 of paragraph 4.7 of the General Terms and Conditions, and the  sentence immediately afterward is deleted in its entirety and replaced with the following: "Within five (5) days after FRANCHISOR's demand, FRANCHISEE must replace dishonored checks and/or rejected EFT with a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees."

4. <u>Lease Option Agreement</u>:  If the real estate is owned by FRANCHISEE or leased by FRANCHISEE from a third-party, you must provide FRANCHISOR, concurrently with the execution of the Franchise Agreement, FRANCHISOR's standard form Lease Option Agreement covering the full term of the Franchise Agreement. In FRANCHISOR's sole discretion, FRANCHISOR may waive this requirement if FRANCHISOR determines that a Lease Option Agreement is unobtainable.

5. <u>Effect of the Offer</u>:  FRANCHISEE already has received a written "Notice to Commence" pursuant to the Offer, and FRANCHISEE shall perform all ongoing obligations under the Offer in accordance with the Offer. It is the intent of this addendum to incorporate and/or include those provisions of the Offer that are not a part of the General Terms and Conditions or of existing Special Terms and Conditions, schedules or attachments. Accordingly, in the event of a conflict between the rights and obligations of the Offer and the terms of this Franchise Agreement (of which all schedules, attachments and this addendum form a part), the terms of the Offer shall prevail.

## EXHIBIT A

### Wholesale Pricing Mechanism

The wholesale price to be paid by franchisees for the Baskin-Robbins products listed on the attached Exhibit III at a given time after royalty conversion will be (i) the price for that product as of the date specified on Exhibit III, (ii) periodically adjusted as described below.  The wholesale price to be paid by franchisees for Baskin-Robbins products will consist of two component parts: "costs" and a "commercial factor."

### I. COSTS

The "cost" component is comprised of the following: manufacturing or acquisition costs, distribution costs and administration costs.  More specific definitions appear below.  All costs will be recognized in accordance with generally accepted principles of accounting.  Wholesale prices may be adjusted periodically, as we determine, resulting from incurred or projected changes in our costs.  We will review any adjustments with designated franchisee representatives to communicate the rationale for the adjustment before it takes effect.  At the end of the first full fiscal year after the conversion date (September 1, 2000 - August 21, 2001), and for each subsequent fiscal year, Baskin-Robbins franchisees as a group may at their expense conduct a single audit of all cost-based adjustments to the prices of products in the preceding fiscal year (the right to audit third parties can not be assured by Baskin-Robbins).  The auditor selected by franchisees must be a certified public accountant experienced in auditing operations involved in the manufacture and distribution of similar products, and must be acceptable to us.  If the auditor determines and we agree that any cost adjustment was improper (i.e. not genuine or permitted by generally accepted accounting principles) we will make a wholesale price adjustment on future sales to correct for the audit result and, if the adjustments identified by the audit and accepted by us exceed five percent (5%) of the then-current commercial factor (i.e. for ice cream, 5% of S.37), we will pay for the cost of the audit.

A. **"Manufacturing Costs"** include but are not limited to all costs associated with raw materials, packaging, and processing described below.
- <u>Raw Material Costs</u>: milk-fat, sugars, flavors and all raw material costs including shrinkage.
- <u>Packaging Costs</u>: side-walls, lids, bottoms, and all other packaging, including shrinkage.
- <u>Processing Costs</u>: direct labor, occupancy and equipment costs including depreciation, indirect labor and overhead, warehousing, storage, load-out costs, manufacturing administration (procuring, processing & paying for manufacturing costs), and all other costs including supplier manufacturing margins.

Exhibit _A_ Page _49_

B.   **"Acquisition Costs"** include but are not limited to all costs associated with purchasing products from manufacturers or other suppliers (including their profit margins) in pre-packaged shipping units, f.o.b. the manufacturer or supplier.

C.   **"Distribution Costs"** include but are not limited to costs associated with warehousing and delivery as defined below:
- Warehousing costs:  the order placement for incoming product, facilitation of inbound freight, receiving, storage, inventory control, order picking, loading, inventory carrying costs, and any management fees directly related.
- Delivery costs:  order processing, transport, store door delivery process, and an adequate level of customer service and management support for handling store level customer service issues.

D.   **"Administration Costs"** include but are not limited to costs associated with invoicing, cash receipts, cash application, collection activities, statement processing, bad debt expense, interest, insurance, regulatory and legal expenses

## II.   COMMERCIAL FACTOR

The following "commercial factors" are adjusted only once annually, according to the consumer price index.  However, Baskin-Robbins may at its discretion lower a commercial factor at any time without regard to the CPI.

A.   <u>Ice Cream Products</u>: The commercial factor for products which contain ice cream is intended to yield an average for all ice cream gallonage of **thirty-seven cents ($0.37) per gallon.** over the course of a fiscal year.

B.   <u>Non-Ice Cream Products</u>:  The commercial factor for products which do not contain ice cream is intended to yield an average for all non-ice-cream shipping units of **six dollars and seventeen cents ($6.17) per shipping unit,** over the course of a fiscal year.

## III.   MISCELLANEOUS

A.   <u>Product Changes</u>.  Additions to and deletions from the Baskin-Robbins product line may be made from time to time at our discretion.  Wholesale prices of additional products will be adjusted in accordance with the provisions above.

B.   <u>Provision For Outsourcing</u>.  Any or all of the manufacturing, distribution, or administration functions may be performed by Baskin-Robbins or a third party, in which case the associated costs would be those of Baskin-Robbins or the prices charged by the third party performing that function.  In any event, Baskin-Robbins remains entitled to the described commercial factor.

C.   <u>B. R. Flavors, Inc.</u>  Profits of B. R. Flavors, Inc. are separate and distinct from the mechanism set forth above.

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this agreement in duplicate, as of the date and year first written above. FRANCHISEE hereby acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) business days prior to the date hereof.   FRANCHISEE further acknowledges having carefully read this agreement in its entirety, including all Schedules identified above and the Personal Guaranty below (if applicable).

FRANCHISOR

BASKIN ROBBINS FRANCHISING LLC

By: _____
Keiko Kimura, Assistant Secretary

This agreement is not binding upon the above entity(ies) until executed by an authorized representative.

**FRANCHISEE ACKNOWLEDGES SECTION 11 OF THE GENERAL TERMS & CONDITIONS OF THIS CONTRACT, WHICH PROVIDES FOR FRANCHISEE'S EXPRESS WAIVER OF RIGHTS TO A JURY TRIAL, TO PARTICIPATE IN CLASS ACTION LAWSUITS, TO OBTAIN PUNITIVE, MULTIPLE OR EXEMPLARY DAMAGES, AND TO BRING ANY CLAIM OR ACTION LATER THAN TWO YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION.**

FRANCHISEE

WITNESS:                                    YUN WORLD INC.

_____            By: _____
Print Name: ZONG    HAN               Hye Sung Yun, President

<u>PERSONAL GUARANTEE BY SHAREHOLDERS OF A CORPORATION</u>
<u>OR MEMBERS OF A LIMITED LIABILITY COMPANY</u>

We, the undersigned, represent and warrant that we constitute
[X]  the shareholders of one hundred percent (100%) of the originally issued and outstanding capital stock of the above FRANCHISEE, a corporation

[ ]  one hundred percent (100%) of the members of the above FRANCHISEE limited liability company ("LLC")

organized under the laws of the state of California waiving demand and notice, the undersigned hereby, jointly and severally, personally guarantee the full payment of FRANCHISEE's money obligations under Section 4 and the performance of all of FRANCHISEE's other obligations under this Franchise Agreement, including, without limitation, paragraph 6.3 and Section 8, in its entirety relative to the restrictions on the activities of FRANCHISEE. We personally agree that the Franchise Agreement shall be binding upon each of us personally.   The undersigned, jointly and severally, agree that FRANCHISOR may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of FRANCHISEE's money obligations under paragraph 4; (b) modify, with the consent of FRANCHISEE, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of FRANCHISOR against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned.   This Guarantee is intended to take effect as a sealed instrument.

_____                _____
                        witness            Hye Sung Yun, individually

_____                _____
                        witness            Chu Han Yun, individually

PC # 331308
Santa Ana, CA

## CERTIFICATION OF FRANCHISEE

DESCRIBE BELOW ALL PROMISES AND REPRESENTATIONS MADE BY FRANCHISOR THAT ARE NOT EXPRESSLY CONTAINED IN THE FRANCHISE AGREEMENT OR UNIFORM FRANCHISE OFFERING CIRCULAR BUT WHICH INFLUENCED FRANCHISEE'S DECISION TO SIGN THIS FRANCHISE AGREEMENT.

*If the answer is "none," please write "NONE" below.*

FRANCHISEE's completion of this page is a material inducement for FRANCHISOR to grant FRANCHISEE this Franchise.   If FRANCHISEE fails to complete, sign and deliver this Certification of Franchisee page to FRANCHISOR along with the Franchise Agreement, FRANCHISOR will not counter-execute the Franchise Agreement or may void the Franchise Agreement if it already has been counter-executed.

THE UNDERSIGNED HEREBY CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS TRUE, that FRANCHISEE had the opportunity to obtain the advice of an attorney, and that FRANCHISEE, and not FRANCHISEE's attorney or other representative, has executed this Certification of Franchisee.

The date of the Certification shall be the date on the Franchise Agreement.

FRANCHISEE:

YUN WORLD INC.

By: _____
Hye Sung Yun, President and Individually

_____
Hye Sung Yun, individually

_____
Chu Han Yun, individually

Print Name: ___T O N G___ ___H A N___
                                                    witness
___T O N G___ ___H A N___
                                                    witness

Exhibit A Page 52

# EXHIBIT

# "B"



1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
PHONE: 310.788.9900
FAX: 310.788.3399
www.perkinscoie.com

Gabriel Liao
PHONE: (310) 788-3208
FAX   (310) 843-1256
EMAIL: GLiao@perkinscoie.com

BY USPS EXPRESS MAIL
AND FIRST CLASS MAIL

EM391117680US

October 22, 2010

Chu Yun and Hye Yun
Yun World Inc.
d/b/a Baskin-Robbins
2278 E. 17th Street
Santa Ana, CA  92705

## NOTICE TO CURE

Re:   PC 331308
      Baskin-Robbins
      Account Balance Due: $9,338.06

Dear Franchisees:

Please be advised that this firm represents the interests of Baskin-Robbins Franchising LLC ("Dunkin' Brands"), with respect to your failure to comply with the requirements of the Franchise Agreement, pursuant to which you operate a franchised business at the address listed:

| Franchisee | Date of Agreement | Location of Business | PC No. | Brand |
|---|---|---|---|---|
| Chu Yun Hye Yun Yun World Inc. | 01/15/08 | 2278 E. 17th Street Santa Ana, CA 92705 | 331308 | Baskin-Robbins |

Pursuant to your Franchise Agreement, this Notice shall serve as fifteen (15) days prior written notice that Dunkin' Brands intends to terminate your franchise for your failure to report gross sales and to make the following payments through October 19, 2010:

99999-9039/LEGAL19450895.1

Exhibit B Page 53

October 22, 2010
Page 2

            Franchise and Advertising Fees in the amount of $8,987.06
            eLearning subscription in the amount of $360.00

If you failed to provide Dunkin' Brands with reports of your gross sales as required by the
Franchise Agreement, all or a portion of the outstanding Franchise Fees and Advertising Fees
may have been estimated based upon prior sales.

You are required to cure these defaults within fifteen days by electronically submitting your sales
to Dunkin' Brands via its FAST sales reporting system, and/or mailing your certified check in
the amount of $9,338.06 to Dunkin' Brands, P O Box 2965, Carol Stream, IL 60132-2965.  In
addition, provide a copy of said check to Gary Zullig by email at gary.zullig@dunkinbrands.com
or fax to 781-737-6212.

You are advised that if you dispute the claimed defaults and contend that this Notice is not
justified, you must advise Dunkin' Brands in writing within seven (7) days of the receipt of this
Notice of the substance of the dispute and provide Dunkin' Brands with any and all information
supporting your claims.  Dunkin' Brands will promptly review the substance of your dispute and
make any adjustments that may be necessary to the amounts shown to be in default and notify
you.  However, any dispute that you raise with respect to the amounts in default, or any claims
that you might purport to have against Dunkin' Brands will not excuse your obligation to pay the
amounts owed to Dunkin' Brands as set out herein above; nor will such claims excuse your
performance of your obligations under the Franchise Agreement.

This notice supplements any Notices of Default and/or Termination previously sent relating to
this store.  This notice does not supersede any prior Notice, nor does it constitute a waiver of any
rights pursuant to any Notice. Failure to cure these defaults within fifteen days (15) days of the
receipt of this Notice, as well as your continued failure to make timely payments and to submit
financial information, as required by your Franchise Agreement with Dunkin' Brands, may result
in termination of your Franchise Agreement.

Very truly yours,

Gabriel Liao
GL:sej
cc:    Gary Zullig
       Wanda Bell
       Steve Zeif
       Josh Robinson

Exhibit _D_ Page _54_

# EXHIBIT

# "C"

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box

PERKINS COIE LLP
1888 Century Park East
Suite 1700
Los Angeles, CA 90067-1721

Liao

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* | |
|---|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired. <br> ■ Print your name and address on the reverse so that we can return the card to you. <br> ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature <br> X ⎯⎯⎯⎯⎯⎯  ☐ Agent  ☐ Addressee | |
| | B. Received by ( *Printed Name*) <br> Hye | C. Date of Delivery |
| 1. Article Addressed to: <br> Chu Yun and Hye Yun <br> Yun World Inc. <br> d/b/a Baskin-Robbins <br> 2278 E. 17th Street <br> Santa Ana, CA  92705 | D. Is delivery address different from item 1?  ☐ Yes <br> If YES, enter delivery address below:  ☐ No <br><br> OCT 2 3 2010 | |
| | 3. Service Type <br> ☐ Certified Mail   ☐ Express Mail <br> ☐ Registered       ☐ Return Receipt for Merchandise <br> ☐ Insured Mail    ☐ C.O.D. | |
| 28028-4648.0001 | 4. Restricted Delivery? (*Extra Fee*)      ☐ Yes | |
| 2. Article Number <br>   (*Transfer from service label*)        EM 391117680 US | | |
| PS Form 3811, February 2004         Domestic Return Receipt | | 102595-02-M-1540 |

Exhibit C Page 55



**UNITED STATES POSTAL SERVICE**®

Track & Confirm          FAQs

# Track & Confirm

## Search Results

Label/Receipt Number: **EM39 1117 680U S**
Status: **Delivered**

Your item was delivered at 11:38 am on October 23, 2010 in SANTA ANA, CA 92705. The item was signed for by Y HYE.

Additional information for this item is stored in files offline.

Restore Offline Details >   (?)    Return to USPS.com Home >

| Track & Confirm |
| --- |
| Enter Label/Receipt Number. |
| |
| Go > |

## Notification Options

### Proof of Delivery

Verify who signed for your item by email, fax, or mail.   Go > |

Site Map   Customer Service   Forms   Gov't Services   Careers   Privacy Policy   Terms of Use   Business Customer Gateway

Copyright© 2010 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA

Exhibit _C_ Page _56_

# EXHIBIT

# "D"



Perkins
Coie

1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
PHONE: 310.788.9900
FAX: 310.788.3399
www.perkinscoie.com

Gabriel Liao
PHONE: (310) 788-3208
FAX:    (310) 843-1256
EMAIL: GLiao@perkinscoie.com

BY USPS EXPRESS MAIL
AND FIRST CLASS MAIL

November 30, 2010

Chu Yun and Hye Yun                        Chu Yun and Hye Yun
Yun World Inc.                             Yun World Inc.
d/b/a Baskin-Robbins                       d/b/a Baskin-Robbins
2278 E. 17th Street                        13282 Orange Knoll Drive
Santa Ana, CA  92705                       Santa Ana, CA  92705

### NOTICE OF TERMINATION

Re:    PC 331308
       Baskin-Robbins

Dear Franchisees:

Please be advised that this firm represents the interests of Baskin-Robbins Franchising LLC ("Dunkin' Brands").  On October 22, 2010, you were sent a Notice to Cure with respect to your delinquency on financial obligations under your Franchise Agreement listed below, pursuant to which you operate a franchised business at the address listed:

| Franchisee | Date of Agreement | Location of Business | PC No. | Brand |
|---|---|---|---|---|
| Chu Yun Hye Yun Yun World Inc. | 01/15/08 | 2278 E. 17th Street Santa Ana, CA  92705 | 331308 | Baskin-Robbins |

ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DENVER · LOS ANGELES · MADISON
MENLO PARK · PHOENIX · PORTLAND · SAN FRANCISCO · SEATTLE · SHANGHAI · WASHINGTON, D.C.
Perkins Coie LLP and Affiliates

Exhibit D  Page 51

November 30, 2010
Page 2

In that Notice you were advised that your Franchise Agreement would be terminated if you failed to cure the defaults noted therein within fifteen (15) days after receiving the Notice.  More than fifteen (15) days have passed since the date that you received the Notice to Cure, and you have failed to cure the defaults noted therein.

**This correspondence shall serve as notice of the Termination of your above-referenced Franchise Agreement with Dunkin' Brands, effective immediately.**

We demand that you immediately pay to Dunkin' Brands all damages it has suffered as a result of your defaults under the Franchise Agreement.  You are hereby notified however, that receipt and retention of such payments, or additional amounts due pursuant to the Franchise Agreement will be held in escrow until the termination is adjudicated and shall not constitute a "cure" or "waiver" with respect to these defaults preventing termination or requiring reinstatement of the Franchise Agreement.

Dunkin' Brands hereby demands that you, your agents, servants and employees take such actions as are necessary to comply with your post-termination obligations as set forth in the Franchise Agreement, including but not limited to, immediately ceasing the use of any methods associated with Dunkin' Brands, ceasing the use of any and all trademarks, service marks, and all other proprietary marks and methods of trade identification, and all trade secrets of Dunkin' Brands, confidential information, signs, symbols, and slogans belonging to Dunkin' Brands.  We further demand that you immediately cease use of, and return all Dunkin' Brands manuals, and comply with the post-termination obligations set forth in the Franchise Agreement.  In addition, please make immediate arrangements with your Operations Manager to immediately de-identify your location of all signs, symbols, slogans and proprietary marks belonging to Dunkin' Brands.

You are advised that if you do not comply with the demands set forth herein pursuant to the termination of your Franchise Agreement, Dunkin' Brands will submit this matter to a Court of competent jurisdiction to seek judicial enforcement of the termination and your post-termination obligations, as well as damages, recovery of the franchised location, attorneys' fees, costs and interest.  This notice supplements any Notices of Default and/or Termination previously sent relating to this store.  This notice does not supersede any prior Notice, nor does it constitute a waiver of any rights pursuant to any Notice.

You remain obligated for all amounts already due, or that will become due, by virtue of your continued operation of the franchised business.  Any and all amounts paid by you, or to be paid by you, while operating during this period may be retained by Dunkin' Brands without waiver of its rights and claims, including the right to terminate the Franchise Agreement or seek injunctive relief.  Any dispute that you raise with respect to the amounts in default, or any claims that you might purport to have against Dunkin' Brands will not excuse your obligation to pay the amounts owed to Dunkin' Brands as set out herein above; nor will such claims excuse your performance of your obligations under the Franchise Agreement.

Exhibit _D_ Page _58_

November 30, 2010
Page 3

If in the event of termination, Dunkin' Brands has the option to assume the lease for the franchised business, Dunkin' Brands will elect whether to exercise its rights pursuant to that option upon the issuance of an Order enforcing this Notice.

Very truly yours,

Gabriel Liao

GL:sej
cc:     Gary Zullig
        Wanda Bell
        Steve Zeif
        Josh Robinson

Exhibit  D  Page 54

# EXHIBIT "E"

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

PERKINS COIE LLP
1888 Century Park East
Suite 1700
Los Angeles, CA 90067-1721

LIAU

---

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X  Pedro Rios  ☐ Agent  ☐ Addressee<br>B. Received by ( *Printed Name*)  C. Date of Delivery<br>Pedro |
| 1. Article Addressed to:<br><br>Chu Yun and Hye Yun<br>Yun World Inc.<br>d/b/a Baskin-Robbins<br>2278 E. 17th Street<br>Santa Ana, CA  92705 | D. Is delivery address different from item 1?  ☐ Yes<br>   If YES, enter delivery address below:  ☐ No |
| 28078-4648-0001 | 3. Service Type<br>☐ Certified Mail  ☒ Express Mail<br>☐ Registered  ☒ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (*Extra Fee*)  ☐ Yes |
| 2. Article Number<br>   (*Transfer from service label*) | EO 985 513 997 US |
| PS Form 3811, February 2004 | Domestic Return Receipt | 102595-02-M-1540 |

Exhibit E Page 60



UNITED STATES
POSTAL SERVICE®

Track & Confirm                                                    FAQs

# Track & Confirm

## Search Results

Label/Receipt Number: **EO98 5513 997U S**
Guaranteed Delivery Date/Time: **December 2, 2010, 3:00 PM**
Class: **Express Mail**®
Service(s): **Return Receipt**
Status: **Delivered**

Your item was delivered at 11:25 am on December 02, 2010 in SANTA
ANA, CA 92705 to CARRIERS EXPRESS 2 . The item was signed for by
P RUIS.

Detailed Results:
- **Delivered, December 02, 2010, 11:25 am, SANTA ANA, CA 92705**
- **Sorting Complete, December 02, 2010, 7:58 am, SANTA ANA, CA 92711**
- **Arrival at Post Office, December 02, 2010, 7:27 am, SANTA ANA, CA 92711**
- **Processed through Sort Facility, December 01, 2010, 11:23 pm, SANTA ANA, CA 92799**
- **Processed through Sort Facility, December 01, 2010, 5:51 pm, LOS ANGELES, CA 90009**
- **Acceptance, December 01, 2010, 3:00 pm, LOS ANGELES, CA 90009**
- **Electronic Shipping Info Received, November 30, 2010**

### Track & Confirm
Enter Label/Receipt Number.

( Go > )

## Notification Options

### Track & Confirm by email

Get current event information or updates for your item sent to you or others by email.  ( Go > )

### Proof of Delivery

Verify who signed for your item by email, fax, or mail.  ( Go > )

Site Map    Customer Service    Forms    Gov't Services    Careers    Privacy Policy    Terms of Use    Business Customer Gateway

Copyright© 2010 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA 

Exhibit _E_ Page _61_

# EXHIBIT

## "F"

RUN DATE:  24-NOV-10

USER :  GZILLIG

CUSTOMER: 18788
LOCATION:

Dunkin' Brands Inc
*********************
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF:  2010/11/24 00:00:00

Yun World Inc.
13282 Orange Knoll Dr
SANTA ANA, CA 92705-2258

SHOP ADDRESS:
2278 E. 17th St
Santa Ana CA 92705-8608
44845

Page 1 of 5

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 331308 | 1110001 | 20140 | 406738780 | 11/19/2009 | A | 11/07/2009 | | 5908000 ALLOCATION-NAF | 31.36 | NA | |
| 331308 | 1110001 | 20140 | 406738780 | 11/19/2009 | A | 11/07/2009 | | 5900000 INDIRECT FUND INCOME | 46.46 | NA | |
| 331308 | 1110001 | 20140 | 406738780 | 11/19/2009 | A | 11/07/2009 | | 5902000 DIRECT/REGIONAL FUND INCOME | 92.92 | NA | |
| 331308 | 1110001 | 20140 | 406738780 | 11/19/2009 | A | 11/07/2009 | | 5901000 NATIONAL ADVERTISING INCOME | 94.08 | NA | |
| 331308 | 1110001 | 20140 | 406738780 | | | 01/21/2010 | | Finance Charges | 8.10 | | |
| 331308 | 1110001 | 20140 | 406738780 | | | 03/27/2010 | | Finance Charges | 3.77 | | |
| 331308 | 1110001 | 20140 | 406738780 | | | 03/27/2010 | | Finance Charges | -3.77 | | |
| 331308 | 1110001 | 20140 | 406738781 | 11/26/2009 | A | 11/14/2009 | | 5908000 ALLOCATION-NAF | 28.26 | NA | |
| 331308 | 1110001 | 20140 | 406738781 | 11/26/2009 | A | 11/14/2009 | | 5900000 INDIRECT FUND INCOME | 41.87 | NA | |
| 331308 | 1110001 | 20140 | 406738781 | 11/26/2009 | A | 11/14/2009 | | 5902000 DIRECT/REGIONAL FUND INCOME | 83.74 | NA | |
| 331308 | 1110001 | 20140 | 406738781 | 11/26/2009 | A | 11/14/2009 | | 5901000 NATIONAL ADVERTISING INCOME | 84.79 | NA | |
| 331308 | 1110001 | 20140 | 406738781 | | | 01/21/2010 | | Finance Charges | 6.47 | | |
| 331308 | 1110001 | 20140 | 406738781 | | | 03/27/2010 | | Finance Charges | 3.38 | | |
| 331308 | 1110001 | 20140 | 406738781 | | | 03/27/2010 | | Finance Charges | -3.38 | | |
| 331308 | 1110001 | 20140 | 406738782 | 12/03/2009 | A | 11/21/2009 | | 5908000 ALLOCATION-NAF | 25.48 | NA | |
| 331308 | 1110001 | 20140 | 406738782 | 12/03/2009 | A | 11/21/2009 | | 5900000 INDIRECT FUND INCOME | 37.76 | NA | |
| 331308 | 1110001 | 20140 | 406738782 | 12/03/2009 | A | 11/21/2009 | | 5902000 DIRECT/REGIONAL FUND INCOME | 75.51 | NA | |
| 331308 | 1110001 | 20140 | 406738782 | 12/03/2009 | A | 11/21/2009 | | 5901000 NATIONAL ADVERTISING INCOME | 76.46 | NA | |
| 331308 | 1110001 | 20140 | 406738782 | | | 01/21/2010 | | Finance Charges | 5.09 | | |
| 331308 | 1110001 | 20140 | 406738782 | | | 03/27/2010 | | Finance Charges | 3.04 | | |
| 331308 | 1110001 | 20140 | 406738782 | | | 03/27/2010 | | Finance Charges | -3.04 | | |
| 331308 | 1110001 | 20140 | 406738784 | 12/10/2009 | A | 11/28/2009 | | 5908000 ALLOCATION-NAF | 25.28 | NA | |
| 331308 | 1110001 | 20140 | 406738784 | 12/10/2009 | A | 11/28/2009 | | 5900000 INDIRECT FUND INCOME | 37.45 | NA | |
| 331308 | 1110001 | 20140 | 406738784 | 12/10/2009 | A | 11/28/2009 | | 5902000 DIRECT/REGIONAL FUND INCOME | 74.90 | NA | |
| 331308 | 1110001 | 20140 | 406738784 | 12/10/2009 | A | 11/28/2009 | | 5901000 NATIONAL ADVERTISING INCOME | 75.84 | NA | |
| 331308 | 1110001 | 20140 | 406738784 | | | 01/21/2010 | | Finance Charges | 4.32 | | |
| 331308 | 1110001 | 20140 | 406738784 | | | 03/27/2010 | | Finance Charges | 3.01 | | |
| 331308 | 1110001 | 20140 | 406738784 | | | 03/27/2010 | | Finance Charges | -3.01 | | |
| 331308 | 1110001 | 20140 | 406738786 | 12/17/2009 | A | 12/05/2009 | | 5908000 ALLOCATION-NAF | 23.99 | NA | |
| 331308 | 1110001 | 20140 | 406738786 | 12/17/2009 | A | 12/05/2009 | | 5900000 INDIRECT FUND INCOME | 35.54 | NA | |
| 331308 | 1110001 | 20140 | 406738786 | 12/17/2009 | A | 12/05/2009 | | 5902000 DIRECT/REGIONAL FUND INCOME | 71.08 | NA | |
| 331308 | 1110001 | 20140 | 406738786 | 12/17/2009 | A | 12/05/2009 | | 5901000 NATIONAL ADVERTISING INCOME | 71.97 | NA | |
| 331308 | 1110001 | 20140 | 406738786 | | | 01/21/2010 | | Finance Charges | 3.40 | | |
| 331308 | 1110001 | 20140 | 406738786 | | | 03/27/2010 | | Finance Charges | 2.84 | | |
| 331308 | 1110001 | 20140 | 406738786 | | | 03/27/2010 | | Finance Charges | -2.84 | | |
| 331308 | 1110001 | 20140 | 406738791 | 12/24/2009 | A | 12/12/2009 | | 5908000 ALLOCATION-NAF | 17.90 | NA | |
| 331308 | 1110001 | 20140 | 406738791 | 12/24/2009 | A | 12/12/2009 | | 5900000 INDIRECT FUND INCOME | 26.52 | NA | |
| 331308 | 1110001 | 20140 | 406738791 | 12/24/2009 | A | 12/12/2009 | | 5902000 DIRECT/REGIONAL FUND INCOME | 53.03 | NA | |
| 331308 | 1110001 | 20140 | 406738791 | 12/24/2009 | A | 12/12/2009 | | 5901000 NATIONAL ADVERTISING INCOME | 53.69 | NA | |
| 331308 | 1110001 | 20140 | 406738791 | | | 01/21/2010 | | Finance Charges | 2.01 | | |

Exhibit F  Page 62

Case 8:11-cv-00031-CJC -RNB   Document 1   Filed 01/06/11   Page 69 of 72   Page ID #:74

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 331308 | 1110001 | 20140 | 406738791 | | | 03/27/2010 | | Finance Charges | 2.11 | | |
| 331308 | 1110001 | 20140 | 406738791 | | | 03/27/2010 | | Finance Charges | -2.11 | | |
| | | | | | | | | | | | |
| 331308 | 1110001 | 20140 | 406738797 | 12/31/2009 | A | 12/19/2009 | | 5900000 ALLOCATION-NAF | 21.88 NA | | |
| 331308 | 1110001 | 20140 | 406738797 | 12/31/2009 | A | 12/19/2009 | | 5900000 INDIRECT FUND INCOME | 32.42 NA | | |
| 331308 | 1110001 | 20140 | 406738797 | 12/31/2009 | A | 12/19/2009 | | 5902000 DIRECT/REGIONAL FUND INCOME | 64.84 NA | | |
| 331308 | 1110001 | 20140 | 406738797 | 12/31/2009 | A | 12/19/2009 | | 5901000 NATIONAL ADVERTISING INCOME | 65.66 NA | | |
| 331308 | 1110001 | 20140 | 406738797 | | | 01/21/2010 | | Finance Charges | 1.82 | | |
| 331308 | 1110001 | 20140 | 406738797 | | | 03/27/2010 | | Finance Charges | 2.58 | | |
| 331308 | 1110001 | 20140 | 406738797 | | | 03/27/2010 | | Finance Charges | -2.58 | | |
| | | | | | | | | | | | |
| 331308 | 1110001 | 20140 | 406738802 | 01/07/2010 | A | 12/26/2009 | | 5900000 ALLOCATION-NAF | 28.87 NA | | |
| 331308 | 1110001 | 20140 | 406738802 | 01/07/2010 | A | 12/26/2009 | | 5900000 INDIRECT FUND INCOME | 42.78 NA | | |
| 331308 | 1110001 | 20140 | 406738802 | 01/07/2010 | A | 12/26/2009 | | 5902000 DIRECT/REGIONAL FUND INCOME | 85.55 NA | | |
| 331308 | 1110001 | 20140 | 406738802 | 01/07/2010 | A | 12/26/2009 | | 5901000 NATIONAL ADVERTISING INCOME | 86.63 NA | | |
| 331308 | 1110001 | 20140 | 406738802 | | | 01/21/2010 | | Finance Charges | 1.56 | | |
| 331308 | 1110001 | 20140 | 406738802 | | | 03/27/2010 | | Finance Charges | 3.39 | | |
| 331308 | 1110001 | 20140 | 406738802 | | | 03/27/2010 | | Finance Charges | -3.39 | | |
| | | | | | | | | | | | |
| 331308 | 1110001 | 20615 | 406777067 | 11/19/2009 | A | 11/07/2009 | | 5300000 CONTINUING FRANCHISE FEES | 274.10 NA | | |
| 331308 | 1110001 | 20615 | 406777067 | | | 01/21/2010 | | Finance Charges | 8.38 | | |
| 331308 | 1110001 | 20615 | 406777067 | | | 03/27/2010 | | Finance Charges | 3.90 | | |
| 331308 | 1110001 | 20615 | 406777067 | | | 03/27/2010 | | Finance Charges | -3.90 | | |
| 331308 | 1110001 | 20615 | 406777067 | | | 08/30/2010 | 1288 | CASH FOR 5300000 CONTINUING FRANCHISE FEES | -88.82 | | |
| 331308 | 1110001 | 20615 | 406777067 | | | 10/29/2010 | 3111 | CASH FOR 5300000 CONTINUING FRANCHISE FEES | -146.27 | | |
| | | | | | | | | | | | |
| 331308 | 1110001 | 20615 | 406777069 | 12/03/2009 | A | 11/21/2009 | | 5300000 CONTINUING FRANCHISE FEES | 222.76 NA | | |
| 331308 | 1110001 | 20615 | 406777069 | | | 01/21/2010 | | Finance Charges | 5.27 | | |
| 331308 | 1110001 | 20615 | 406777069 | | | 03/27/2010 | | Finance Charges | 3.15 | | |
| 331308 | 1110001 | 20615 | 406777069 | | | 03/27/2010 | | Finance Charges | -3.15 | | |
| | | | | | | | | | | | |
| 331308 | 1110001 | 20615 | 406777071 | 12/10/2009 | A | 11/28/2009 | | 5300000 CONTINUING FRANCHISE FEES | 220.97 NA | | |
| 331308 | 1110001 | 20615 | 406777071 | | | 01/21/2010 | | Finance Charges | 4.47 | | |
| 331308 | 1110001 | 20615 | 406777071 | | | 03/27/2010 | | Finance Charges | 3.11 | | |
| 331308 | 1110001 | 20615 | 406777071 | | | 03/27/2010 | | Finance Charges | -3.11 | | |
| | | | | | | | | | | | |
| 331308 | 1110001 | 20615 | 406777073 | 12/17/2009 | A | 12/05/2009 | | 5300000 CONTINUING FRANCHISE FEES | 209.68 NA | | |
| 331308 | 1110001 | 20615 | 406777073 | | | 01/21/2010 | | Finance Charges | 3.52 | | |
| 331308 | 1110001 | 20615 | 406777073 | | | 03/27/2010 | | Finance Charges | 2.94 | | |
| 331308 | 1110001 | 20615 | 406777073 | | | 03/27/2010 | | Finance Charges | -2.94 | | |
| | | | | | | | | | | | |
| 331308 | 1110001 | 20615 | 406777078 | 12/24/2009 | A | 12/12/2009 | | 5300000 CONTINUING FRANCHISE FEES | 156.45 NA | | |
| 331308 | 1110001 | 20615 | 406777078 | | | 01/21/2010 | | Finance Charges | 2.08 | | |
| 331308 | 1110001 | 20615 | 406777078 | | | 03/27/2010 | | Finance Charges | 2.19 | | |
| 331308 | 1110001 | 20615 | 406777078 | | | 03/27/2010 | | Finance Charges | -2.19 | | |
| | | | | | | | | | | | |
| 331308 | 1110001 | 20615 | 406777084 | 12/31/2009 | A | 12/19/2009 | | 5300000 CONTINUING FRANCHISE FEES | 191.29 NA | | |
| 331308 | 1110001 | 20615 | 406777084 | | | 01/21/2010 | | Finance Charges | 1.89 | | |
| 331308 | 1110001 | 20615 | 406777084 | | | 03/27/2010 | | Finance Charges | 2.67 | | |
| 331308 | 1110001 | 20615 | 406777084 | | | 03/27/2010 | | Finance Charges | -2.67 | | |
| | | | | | | | | | | | |
| 331308 | 1110001 | 20615 | 406777089 | 01/07/2010 | A | 12/26/2009 | | 5300000 CONTINUING FRANCHISE FEES | 252.38 NA | | |
| 331308 | 1110001 | 20615 | 406777089 | | | 01/21/2010 | | Finance Charges | 1.62 | | |
| 331308 | 1110001 | 20615 | 406777089 | | | 03/27/2010 | | Finance Charges | 3.51 | | |
| 331308 | 1110001 | 20615 | 406777089 | | | 03/27/2010 | | Finance Charges | -3.51 | | |

Exhibit F Page 63

| PROFIT CENTER | GL NUMBER | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 331308 | 1110001 | 20140 | 406953366 | 01/14/2010 | A | 01/02/2010 | | 5908000 ALLOCATION-NAF | 13.19 | NA | |
| 331308 | 1110001 | 20140 | 406953366 | 01/14/2010 | A | 01/02/2010 | | 5900000 INDIRECT FUND INCOME | 26.37 | NA | |
| 331308 | 1110001 | 20140 | 406953366 | 01/14/2010 | A | 01/02/2010 | | 5901000 NATIONAL ADVERTISING INCOME | 39.56 | NA | |
| 331308 | 1110001 | 20140 | 406953366 | 01/14/2010 | A | 01/02/2010 | | 5902000 DIRECT/REGIONAL FUND INCOME | 52.75 | NA | |
| 331308 | 1110001 | 20140 | 406953366 | | | 02/26/2010 | | Finance Charges | 2.73 | | |
| 331308 | 1110001 | 20140 | 406953366 | | | 03/27/2010 | | Finance Charges | 1.86 | | |
| 331308 | 1110001 | 20140 | 406953366 | | | 03/27/2010 | | Finance Charges | -1.86 | | |
| 331308 | 1110001 | 20140 | 406953371 | 01/21/2010 | A | 01/09/2010 | | 5908000 ALLOCATION-NAF | 33.29 | NA | |
| 331308 | 1110001 | 20140 | 406953371 | 01/21/2010 | A | 01/09/2010 | | 5900000 INDIRECT FUND INCOME | 66.58 | NA | |
| 331308 | 1110001 | 20140 | 406953371 | 01/21/2010 | A | 01/09/2010 | | 5901000 NATIONAL ADVERTISING INCOME | 99.88 | NA | |
| 331308 | 1110001 | 20140 | 406953371 | 01/21/2010 | A | 01/09/2010 | | 5902000 DIRECT/REGIONAL FUND INCOME | 133.17 | NA | |
| 331308 | 1110001 | 20140 | 406953371 | | | 02/26/2010 | | Finance Charges | 5.75 | | |
| 331308 | 1110001 | 20140 | 406953371 | | | 03/27/2010 | | Finance Charges | 4.68 | | |
| 331308 | 1110001 | 20140 | 406953371 | | | 03/27/2010 | | Finance Charges | -4.68 | | |
| 331308 | 1110001 | 20140 | 406953375 | 01/28/2010 | A | 01/16/2010 | | 5908000 ALLOCATION-NAF | 22.65 | NA | |
| 331308 | 1110001 | 20140 | 406953375 | 01/28/2010 | A | 01/16/2010 | | 5900000 INDIRECT FUND INCOME | 45.30 | NA | |
| 331308 | 1110001 | 20140 | 406953375 | 01/28/2010 | A | 01/16/2010 | | 5901000 NATIONAL ADVERTISING INCOME | 67.95 | NA | |
| 331308 | 1110001 | 20140 | 406953375 | 01/28/2010 | A | 01/16/2010 | | 5902000 DIRECT/REGIONAL FUND INCOME | 90.60 | NA | |
| 331308 | 1110001 | 20140 | 406953375 | | | 02/26/2010 | | Finance Charges | 3.13 | | |
| 331308 | 1110001 | 20140 | 406953375 | | | 03/27/2010 | | Finance Charges | 3.17 | | |
| 331308 | 1110001 | 20140 | 406953375 | | | 03/27/2010 | | Finance Charges | -3.17 | | |
| 331308 | 1110001 | 20140 | 406953382 | 02/04/2010 | A | 01/23/2010 | | 5908000 ALLOCATION-NAF | 16.28 | NA | |
| 331308 | 1110001 | 20140 | 406953382 | 02/04/2010 | A | 01/23/2010 | | 5900000 INDIRECT FUND INCOME | 32.55 | NA | |
| 331308 | 1110001 | 20140 | 406953382 | 02/04/2010 | A | 01/23/2010 | | 5901000 NATIONAL ADVERTISING INCOME | 48.83 | NA | |
| 331308 | 1110001 | 20140 | 406953382 | 02/04/2010 | A | 01/23/2010 | | 5902000 DIRECT/REGIONAL FUND INCOME | 65.11 | NA | |
| 331308 | 1110001 | 20140 | 406953382 | | | 02/26/2010 | | Finance Charges | 1.69 | | |
| 331308 | 1110001 | 20140 | 406953382 | | | 03/27/2010 | | Finance Charges | 2.27 | | |
| 331308 | 1110001 | 20140 | 406953382 | | | 03/27/2010 | | Finance Charges | -2.27 | | |
| 331308 | 1110001 | 20140 | 406953393 | 02/11/2010 | A | 01/30/2010 | | 5908000 ALLOCATION-NAF | 21.10 | NA | |
| 331308 | 1110001 | 20140 | 406953393 | 02/11/2010 | A | 01/30/2010 | | 5900000 INDIRECT FUND INCOME | 42.20 | NA | |
| 331308 | 1110001 | 20140 | 406953393 | 02/11/2010 | A | 01/30/2010 | | 5901000 NATIONAL ADVERTISING INCOME | 63.31 | NA | |
| 331308 | 1110001 | 20140 | 406953393 | 02/11/2010 | A | 01/30/2010 | | 5902000 DIRECT/REGIONAL FUND INCOME | 84.41 | NA | |
| 331308 | 1110001 | 20140 | 406953393 | | | 02/26/2010 | | Finance Charges | 1.46 | | |
| 331308 | 1110001 | 20140 | 406953393 | | | 03/27/2010 | | Finance Charges | 2.93 | | |
| 331308 | 1110001 | 20140 | 406953393 | | | 03/27/2010 | | Finance Charges | -2.93 | | |
| 331308 | 1110001 | 20140 | 406953405 | 02/18/2010 | A | 02/06/2010 | | 5908000 ALLOCATION-NAF | 22.24 | NA | |
| 331308 | 1110001 | 20140 | 406953405 | 02/18/2010 | A | 02/06/2010 | | 5900000 INDIRECT FUND INCOME | 44.47 | NA | |
| 331308 | 1110001 | 20140 | 406953405 | 02/18/2010 | A | 02/06/2010 | | 5901000 NATIONAL ADVERTISING INCOME | 66.71 | NA | |
| 331308 | 1110001 | 20140 | 406953405 | 02/18/2010 | A | 02/06/2010 | | 5902000 DIRECT/REGIONAL FUND INCOME | 88.95 | NA | |
| 331308 | 1110001 | 20140 | 406953405 | | | 02/26/2010 | | Finance Charges | 0.77 | | |
| 331308 | 1110001 | 20140 | 406953405 | | | 03/27/2010 | | Finance Charges | 3.08 | | |
| 331308 | 1110001 | 20140 | 406953405 | | | 03/27/2010 | | Finance Charges | -3.08 | | |
| 331308 | 1110001 | 20140 | 406953439 | 02/25/2010 | A | 02/13/2010 | | 5908000 ALLOCATION-NAF | 25.64 | NA | |
| 331308 | 1110001 | 20140 | 406953439 | 02/25/2010 | A | 02/13/2010 | | 5900000 INDIRECT FUND INCOME | 51.28 | NA | |
| 331308 | 1110001 | 20140 | 406953439 | 02/25/2010 | A | 02/13/2010 | | 5901000 NATIONAL ADVERTISING INCOME | 76.92 | NA | |
| 331308 | 1110001 | 20140 | 406953439 | 02/25/2010 | A | 02/13/2010 | | 5902000 DIRECT/REGIONAL FUND INCOME | 102.56 | NA | |
| 331308 | 1110001 | 20140 | 406953439 | | | 02/13/2010 | | Finance Charges | 0.77 | | |
| 331308 | 1110001 | 20140 | 406953439 | | | 03/27/2010 | | Finance Charges | 3.54 | | |
| 331308 | 1110001 | 20140 | 406953439 | | | 03/27/2010 | | Finance Charges | -3.54 | | |



| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 331308 | 1110001 | 20615 | 406955151 | 01/14/2010 | A | 01/02/2010 | | 5300000 CONTINUING FRANCHISE FEES | 155.61 | NA | |
| 331308 | 1110001 | 20615 | 406955151 | | | 02/26/2010 | | Finance Charges | 3.22 | | |
| 331308 | 1110001 | 20615 | 406955151 | | | 03/27/2010 | | Finance Charges | 2.19 | | |
| 331308 | 1110001 | 20615 | 406955151 | | | 03/27/2010 | | Finance Charges | -2.19 | | |
| 331308 | 1110001 | 20615 | 406955156 | 01/21/2010 | A | 01/09/2010 | | 5300000 CONTINUING FRANCHISE FEES | 392.85 | NA | |
| 331308 | 1110001 | 20615 | 406955156 | | | 02/26/2010 | | Finance Charges | 6.78 | | |
| 331308 | 1110001 | 20615 | 406955156 | | | 03/27/2010 | | Finance Charges | 5.52 | | |
| 331308 | 1110001 | 20615 | 406955156 | | | 03/27/2010 | | Finance Charges | -5.52 | | |
| 331308 | 1110001 | 20615 | 406955160 | 01/28/2010 | A | 01/16/2010 | | 5300000 CONTINUING FRANCHISE FEES | 267.27 | NA | |
| 331308 | 1110001 | 20615 | 406955160 | | | 02/26/2010 | | Finance Charges | 3.69 | | |
| 331308 | 1110001 | 20615 | 406955160 | | | 03/27/2010 | | Finance Charges | 3.74 | | |
| 331308 | 1110001 | 20615 | 406955160 | | | 03/27/2010 | | Finance Charges | -3.74 | | |
| 331308 | 1110001 | 20615 | 406955167 | 02/04/2010 | A | 01/23/2010 | | 5300000 CONTINUING FRANCHISE FEES | 192.07 | NA | |
| 331308 | 1110001 | 20615 | 406955167 | | | 02/26/2010 | | Finance Charges | 1.99 | | |
| 331308 | 1110001 | 20615 | 406955167 | | | 03/27/2010 | | Finance Charges | 2.68 | | |
| 331308 | 1110001 | 20615 | 406955167 | | | 03/27/2010 | | Finance Charges | -2.68 | | |
| 331308 | 1110001 | 20615 | 406955178 | 02/11/2010 | A | 01/30/2010 | | 5300000 CONTINUING FRANCHISE FEES | 249.01 | NA | |
| 331308 | 1110001 | 20615 | 406955178 | | | 02/26/2010 | | Finance Charges | 1.72 | | |
| 331308 | 1110001 | 20615 | 406955178 | | | 03/27/2010 | | Finance Charges | 3.46 | | |
| 331308 | 1110001 | 20615 | 406955178 | | | 03/27/2010 | | Finance Charges | -3.46 | | |
| 331308 | 1110001 | 20615 | 406955190 | 02/18/2010 | A | 02/06/2010 | | 5300000 CONTINUING FRANCHISE FEES | 262.39 | NA | |
| 331308 | 1110001 | 20615 | 406955190 | | | 02/26/2010 | | Finance Charges | 0.91 | | |
| 331308 | 1110001 | 20615 | 406955190 | | | 03/27/2010 | | Finance Charges | 3.64 | | |
| 331308 | 1110001 | 20615 | 406955190 | | | 03/27/2010 | | Finance Charges | -3.64 | | |
| 331308 | 1110001 | 20615 | 406955224 | 02/25/2010 | A | 02/13/2010 | | 5300000 CONTINUING FRANCHISE FEES | 302.54 | NA | |
| 331308 | 1110001 | 20615 | 406955224 | | | 03/27/2010 | | Finance Charges | 4.18 | | |
| 331308 | 1110001 | 20615 | 406955224 | | | 03/27/2010 | | Finance Charges | -4.18 | | |
| 331308 | 1110001 | 20140 | 408118712 | 10/14/2010 | E | 10/02/2010 | | 5908000 ALLOCATION-NAF | 28.07 | NA | |
| 331308 | 1110001 | 20140 | 408118712 | 10/14/2010 | E | 10/02/2010 | | 5900000 INDIRECT FUND INCOME | 56.14 | NA | |
| 331308 | 1110001 | 20140 | 408118712 | 10/14/2010 | E | 10/02/2010 | | 5901000 NATIONAL ADVERTISING INCOME | 84.21 | NA | |
| 331308 | 1110001 | 20140 | 408118712 | 10/14/2010 | E | 10/02/2010 | | 5902000 DIRECT/REGIONAL FUND INCOME | 112.28 | NA | |
| 331308 | 1110001 | 20140 | 408118712 | | | 10/23/2010 | | Finance Charges | 1.25 | | |
| 331308 | 1110001 | 20615 | 408151320 | 10/14/2010 | E | 10/02/2010 | | 5300000 CONTINUING FRANCHISE FEES | 331.22 | NA | |
| 331308 | 1110001 | 20615 | 408151320 | | | 10/23/2010 | | Finance Charges | 1.47 | | |
| 331308 | 1110001 | 20140 | 408278366 | 11/18/2010 | E | 11/06/2010 | | 5908000 ALLOCATION-NAF | 21.97 | NA | |
| 331308 | 1110001 | 20140 | 408278366 | 11/18/2010 | E | 11/06/2010 | | 5900000 INDIRECT FUND INCOME | 43.95 | NA | |
| 331308 | 1110001 | 20140 | 408278366 | 11/18/2010 | E | 11/06/2010 | | 5901000 NATIONAL ADVERTISING INCOME | 65.92 | NA | |
| 331308 | 1110001 | 20140 | 408278366 | 11/18/2010 | E | 11/06/2010 | | 5902000 DIRECT/REGIONAL FUND INCOME | 87.89 | NA | |
| 331308 | 1110001 | 20140 | 408278982 | 11/25/2010 | E | 11/13/2010 | | 5908000 ALLOCATION-NAF | 15.89 | NA | |
| 331308 | 1110001 | 20140 | 408278982 | 11/25/2010 | E | 11/13/2010 | | 5900000 INDIRECT FUND INCOME | 31.78 | NA | |
| 331308 | 1110001 | 20140 | 408278982 | 11/25/2010 | E | 11/13/2010 | | 5901000 NATIONAL ADVERTISING INCOME | 47.67 | NA | |
| 331308 | 1110001 | 20140 | 408278982 | 11/25/2010 | E | 11/13/2010 | | 5902000 DIRECT/REGIONAL FUND INCOME | 63.56 | NA | |
| 331308 | 1110001 | 20140 | 408280106 | 12/02/2010 | E | 11/20/2010 | | 5908000 ALLOCATION-NAF | 15.89 | NA | |

Exhibit F   Page 65

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/B | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 331308 | 1110001 | 20140 | 408280106 | 12/02/2010 | E | 11/20/2010 | | 5900000 INDIRECT FUND INCOME | 31.78 | NA | |
| 331308 | 1110001 | 20140 | 408280106 | 12/02/2010 | E | 11/20/2010 | | 5901000 NATIONAL ADVERTISING INCOME | 47.67 | NA | |
| 331308 | 1110001 | 20140 | 408280106 | 12/02/2010 | E | 11/20/2010 | | 5902000 DIRECT/REGIONAL FUND INCOME | 63.56 | NA | |
| 331308 | 1110001 | 20140 | 408282009 | 12/09/2010 | E | 11/27/2010 | | 5908000 ALLOCATION-NAF | 15.89 | NA | |
| 331308 | 1110001 | 20140 | 408282009 | 12/09/2010 | E | 11/27/2010 | | 5900000 INDIRECT FUND INCOME | 31.78 | NA | |
| 331308 | 1110001 | 20140 | 408282009 | 12/09/2010 | E | 11/27/2010 | | 5901000 NATIONAL ADVERTISING INCOME | 47.67 | NA | |
| 331308 | 1110001 | 20140 | 408282009 | 12/09/2010 | E | 11/27/2010 | | 5902000 DIRECT/REGIONAL FUND INCOME | 63.56 | NA | |
| 331308 | 1110001 | 20615 | 408316977 | 11/18/2010 | E | 11/06/2010 | | 5300000 CONTINUING FRANCHISE FEES | 259.28 | NA | |
| 331308 | 1110001 | 20615 | 408317593 | 11/25/2010 | E | 11/13/2010 | | 5300000 CONTINUING FRANCHISE FEES | 187.49 | NA | |
| 331308 | 1110001 | 20615 | 408318716 | 12/02/2010 | E | 11/20/2010 | | 5300000 CONTINUING FRANCHISE FEES | 187.49 | NA | |
| 331308 | 1110001 | 20615 | 408320616 | 12/09/2010 | E | 11/27/2010 | | 5300000 CONTINUING FRANCHISE FEES | 187.49 | NA | |

```
                    TOTAL FOR GL:        1110001                      ----------
                                                                       8,599.30

                    TOTAL FOR BRAND :    BR                           ----------
                                                                       8,599.30

                    TOTAL FOR CUSTOMER :                              ----------
                                                                       8,599.30

                    REPORT GRAND TOTAL :                             ============
                                                                       8,599.30
                                                                    ============
```

*** CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial
representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If
there are any questions, please refer them to your Collections Specialist.

Exhibit F Page 66